UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
PILAR ROMERO, as biological mother
and lawful guardian of JANE DOE,
a minor,

              Plaintiffs,

   -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION; NEW YORK
CITY DEPARTMENT OF INVESTIGATION,
SPECIAL COMMISSIONER OF
INVESTIGATION FOR THE NEW YORK CITY
SCHOOL DISTRICT; ANDRE JENKINS;
JULIO CESARE BENAVIDES, and JACK ROE
and JILL ROE 1 through 48,

              Defendants.

----------------------------------X

**MEMORANDUM AND ORDER**

08-CV-2529 (KAM)

**MATSUMOTO, United States District Judge:**

        On June 25, 2008, plaintiff Pilar Romero commenced this action as the biological mother and legal guardian of her then-minor daughter Jane Doe (together with Pilar Romero, "plaintiffs") against defendants the City of New York (the "City"); the New York City Department of Education ("the NYCDOE"); the Special Commissioner of Investigation for the New York City School District ("SCI"), a subdivision of the New York City Department of Investigation; Andre Jenkins ("Investigator Jenkins") in his official capacity as an investigator employed by SCI; Julio Cesare Benavides, individually and in his official capacity as a teacher employed by the NYCDOE; and unknown

1

defendants Jack Roe and Jill Roe 1 through 48 (collectively, "defendants"). (*See* ECF No. 87, Second Amended Complaint ("Compl.") at ¶¶ 1-9.) The action arises out of an illegal sexual relationship that *pro se* defendant Mr. Benavides conducted with plaintiff Jane Doe when she was a fourteen-year-old freshman high school student in Mr. Benavides' mathematics class.

Plaintiffs allege two federal claims against all defendants:  (1) that defendants engaged in sex discrimination against Ms. Doe in violation of Title IX of the Education Amendments of 1972, codified as 20 U.S.C. §§ 1681 *et seq.*; and (2) that defendants deprived Ms. Doe of her constitutional rights in violation of 42 U.S.C. § 1983. (*Id.* ¶¶ 30-34.) In addition, plaintiffs bring five state law claims alleging that the City and the NYCDOE, either themselves or through their employees, engaged in intentional infliction of emotional distress, negligent infliction of emotional distress, sexual assault and battery of a child, negligent hiring, and negligent retention. (*Id.* ¶¶ 35-40, 46-60.) Finally, plaintiffs allege that all defendants engaged in sexual harassment in violation of New York State Human Rights Laws (the "NYSHRL") pursuant to New York Executive Law § 296, which is the sixth state law claim. (*Id.* ¶¶ 41-45.) For all these claims, plaintiffs seek in excess of $50 million in compensatory, special, and punitive damages as well as costs and attorneys' fees. (*Id.* at 15.) The court has original federal-

question jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

Presently before the court are defendants' motions for summary judgment on all of plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, the motions for summary judgment by the City, the NYCDOE, SCI, and Investigator Jenkins are granted in their entirety on all claims against them.  The court grants in part and denies in part Mr. Benavides' motion for summary judgment as follows:  (1) grants Mr. Benavides summary judgment on plaintiffs' Title IX claims; (2) grants Mr. Benavides summary judgment on plaintiffs' Section 1983 claims against him in his official capacity, and on Ms. Romero's Section 1983 claim against him in his individual capacity; (3) denies Mr. Benavides summary judgment on Ms. Doe's Section 1983 claim against him in his individual capacity for violations of Ms. Doe's constitutional rights to bodily integrity and to an educational environment free of sexual harassment; (4) grants Mr. Benavides summary judgment on Ms. Romero's negligent infliction of emotional distress claim; (5) denies Mr. Benavides summary judgment on Ms. Doe's negligent infliction of emotional distress claim; and (6) grants Mr. Benavides summary judgment on plaintiffs' NYSHRL claims.

## BACKGROUND

On June 25, 2008, plaintiff Pilar Romero commenced this action as the biological mother and legal guardian of her then-minor daughter Jane Doe against the City, the NYCDOE, Mr. Benavides, and Jack Roe 1 through 10 and Jill Roe 1 through 10. (*See* ECF No. 1, Complaint.)  Plaintiffs then filed an amended complaint on July 16, 2008, adding certain claims against the City, the NYCDOE, and Mr. Benavides.  (*See* ECF No. 2, Amended Complaint.)  After fact discovery was completed on December 9, 2010 (*see* Minute Entry dated December 9, 2010), plaintiffs filed the Second Amended Complaint on April 1, 2011, dropping certain claims and adding defendants SCI and Investigator Jenkins.

On July 18, 2011, the City, the NYCDOE, SCI, and Investigator Jenkins (collectively, the "City Defendants") filed the pending summary judgment motion with respect to all of plaintiffs' claims.  (See ECF No. 102, City Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("City Defs. Mem.").)  On July 20, 2011, *pro se* defendant Mr. Benavides filed a motion for summary judgment with respect to plaintiffs' claims against him, which include claims under Title IX, Section 1983, and New York Executive Law § 296.  (*See* ECF No. 110-3, Benavides' Memorandum of Law in Support of Motion for Summary Judgment ("Benavides Mem.").)  Plaintiffs oppose both the City Defendants' and Mr. Benavides' respective motions for

4

summary judgment.  (*See* ECF No. 107, Memorandum in Opposition to City Defendants' Summary Judgment Motion ("Pls. City Opp'n"); ECF No. 111, Memorandum of Law in Opposition to Julio C. Benavides' Summary Judgment Motion ("Pls. Benavides Opp'n").)  Finally, the City Defendants and Mr. Benavides filed reply memoranda and supplemental reply memoranda in support of their motions for summary judgment because plaintiffs failed to serve defendants with a copy of their Local Civil Rule 56.1 Counter-Statement of Material Facts.  (*See* Order dated July 22, 2011; ECF No. 105, City Defendants' Reply Memorandum of Law in Further Support of Motion for Summary Judgment ("City Defs. Reply"); ECF No. 119, City Defendants' Supplemental Reply Memorandum of Law in Further Support of Motion for Summary Judgment ("City Defs. Suppl. Reply"); ECF No. 113, Benavides' Reply Memorandum of Law in Support of Motion for Summary Judgment ("Benavides Reply"); ECF No. 121, Benavides' Supplemental Reply in Further Support of Motion for Summary Judgment ("Benavides Suppl. Reply").)

## STATEMENT OF FACTS

The following facts, taken from the parties' statements pursuant to Local Civil Rule 56.1 and accompanying exhibits, are undisputed unless otherwise indicated.  (*See generally* ECF No. 100-2, City Defendants' Local Rule 56.1 Statement of Material Facts ("City 56.1 Stmt."); ECF No. 107-2, Plaintiffs' Local Rule 56.1 Statement of Material Facts relating to City Defendants

("Pls. City 56.1 Stmt."); ECF No. 110-2, Benavides' Statement of Facts ("Benavides 56.1 Stmt."); ECF No. 111-2, Plaintiffs' Local Rule 56.1 Statement of Material Facts relating to Defendant Benavides ("Pls. Benavides 56.1 Stmt.").)  The court has considered whether the parties have proffered admissible evidence in support of their factual statements and has viewed the facts in the light most favorable to the nonmoving plaintiffs.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that, in determining the appropriateness of a grant of summary judgment, . . . the district court in awarding summary judgment, may rely only on admissible evidence." (citations and quotation marks omitted)); *Scotto v. Brady*, 410 Fed. App'x 355, 361 (2d Cir.  2010) ("'[A] district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence,' and that '[t]he principles governing admissibility of evidence do not change on a motion for summary judgment.'" (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009))).  Finally, the court has also considered other materials in the record that have not been cited by the parties.  *See* Fed. R. Civ. P. 56(c)(3).

During the 2006-2007 school year, plaintiff Jane Doe ("Ms. Doe") was a 14-year-old ninth-grade student[1] attending

---

[1]  The complaint alleges and defendants do not dispute, that Jane Doe was born on August 12, 1992.  (Compl. ¶ 1.)

Richmond Hill High School ("Richmond Hill") in Richmond Hill, Queens, New York, and *pro se* defendant Julio Benavides ("Mr. Benavides") was a 28-year-old mathematics teacher at Richmond Hill employed by the NYCDOE.[2]  (City 56.1 Stmt. ¶¶ 1-3; Pls. City 56.1 Stmt. ¶ 2; Benavides 56.1 Stmt. ¶¶ 1-3.)  Ms. Doe was a student in Mr. Benavides' mathematics class in the Fall Semester of the 2006-2007 school year.  (City 56.1 Stmt. ¶ 4; Benavides 56.1 Stmt. ¶¶ 4-5.)

In or around November 2006, after having communicated outside of class via instant messenger, Mr. Benavides told Ms. Doe – a minor at the time – that he loved her and that he wanted to spend time with her.  (Benavides 56.1 Stmt. ¶ 6; Transcript of Deposition of Jane Doe dated April 29, 2009 (attached as Exhibit C to ECF No. 108, Declaration of Plaintiffs' Counsel in Opposition to City Defendants' Motion for Summary Judgment ("Pls. Decl.")) ("04/29/09 Doe Dep. Tr.") at 9-10.)  Over subsequent months, Mr. Benavides proceeded to spend time with Ms. Doe, promising her love and affection and the two exchanged small gifts.  (04/29/09 Doe Dep. Tr. at 10-13, 36-37.)  In addition to class time, and in view of other students and school staff, none of whom were identified by name, Mr. Benavides and Ms. Doe also

---

[2] Defendant NYCDOE is a government department organized and managed under the laws of the City and charged with the management and control of Richmond Hill.  (Compl. ¶ 3).  The NYCDOE receives federal financial assistance for its public education programs.  (*Id.*)

began to spend significant time together during the school day on a regular basis by having lunch together, walking together in the hallway, and sitting together in a secluded area of the library. (*Id.* 58-60.)  In addition, Mr. Benavides touched and kissed Ms. Doe on the campus of Richmond Hill, including in the library, in classrooms, and on the stairs, however, there is no evidence that anyone saw Ms. Doe and Mr. Benavides touching or kissing.  Ms. Doe also visited Mr. Benavides at his mother's home and his apartment.  (*Id.* at 13-19, 26-29; Benavides 56.1 Stmt. ¶ 8.)

Jane Doe had refused Mr. Benavides' requests to have sexual intercourse until January 2007 when Mr. Benavides and Ms. Doe had sexual intercourse for the first time at his apartment. (04/29/09 Doe Dep. Tr. at 13, 27, 30; City 56.1 Stmt. ¶ 6.) During their illegal sexual relationship, Mr. Benavides and Ms. Doe had sexual intercourse four or five times between January and June of 2007, when Mr. Benavides was removed from Richmond Hill because of this conduct.  (City 56.1 Stmt. ¶¶ 7, 31-32.)  During their entire relationship, Mr. Benavides knew that Ms. Doe was a minor, and Ms. Doe did not receive any special favors from Mr. Benavides as her teacher, always had the same academic responsibilities as other students in his class, and her academic work was never treated differently than other students' work. (Benavides 56.1 Stmt. ¶¶ 14-16.)

Mr. Benavides and Ms. Doe took affirmative actions to maintain the secrecy of their relationship and to avoid detection. (City 56.1 Stmt. ¶¶ 8-13.) From the first day of their relationship, Mr. Benavides instructed Ms. Doe not to tell anyone about the relationship because he could get into trouble, and, indeed, Ms. Doe did not tell anyone - including her friends - about any aspect of the relationship while it was ongoing. (*Id.* ¶¶ 8-9.) Ms. Doe and Mr. Benavides would also not go out in public together, would wait until everyone had left Richmond Hill – including the janitor - to go to Mr. Benavides' classroom and kiss, and Ms. Doe had telephone conversations with Mr. Benavides on a pay phone, even alternating the pay phone that she used to speak with him. (*Id.* ¶ 10.) In the library, Mr. Benavides and Ms. Doe would sit in an "isolated" area at a back table behind two bookshelves and computers, and Mr. Benavides would touch Ms. Doe's hand or leg under the table, but they did not kiss. (04/29/09 Doe Dep. Tr. at 14-17.) If they were in the stairway of Richmond Hill kissing and heard someone coming toward the stairs, Mr. Benavides and Ms. Doe would immediately stop kissing and separate to avoid detection. (*Id.* at 19-22.) Additionally, when Ms. Doe visited Mr. Benavides, once at his mother's house, he directed Ms. Doe to take a taxi to a location several blocks away from the house and to walk to the house. (City 56.1 Stmt. ¶ 11; 04/29/09 Doe Dep. Tr. at 26-27.) Similarly, when Ms. Doe

9

visited Mr. Benavides at an apartment to which he subsequently moved, he gave her directions while she was in a taxi using a private phone number that would not be recorded on Ms. Doe's cell phone.  (City 56.1 Stmt. ¶ 12.)  Finally, Mr. Benavides also left the door to his apartment open so that Ms. Doe could walk inside because he did not want anyone to see him meeting her at the front door.  (*Id.* ¶ 13.)

At an unspecified time prior to June 2007, rumors that Mr. Benavides was Ms. Doe's boyfriend began to circulate among the students at Richmond Hill.  (*Id.* ¶ 14.)  Ms. Doe responded to this rumor by saying it was a lie and denying the rumor because she was scared something bad would happen to Mr. Benavides if anyone learned of their relationship.  (*Id.* ¶ 15.)  On Wednesday, June 6, 2007, one of Ms. Doe's friends ("Student A") informed Raffaella Mottola, Ms. Doe's global studies teacher, about a relationship between Ms. Doe and Mr. Benavides.  (*Id.* ¶ 17.)  Specifically, at the beginning of the class period, Student A told Ms. Mottola that (1) Ms. Doe was in trouble with her mother because she had exceeded the minutes on her cell phone, (2) there was a blocked or restricted number on Ms. Doe's phone, (3) Mr. Benavides was the person who was calling Ms. Doe, and (4) Mr. Benavides and Ms. Doe were dating.  (*Id.* ¶¶ 18-19.)  That same day, immediately after the class period ended, Ms. Mottola informed Kimberly Himonides, the assistant principal of guidance,

about her conversation with Student A.  (*Id.* ¶ 21.)  Ms. Mottola

and Assistant Principal Himonides then immediately spoke with

Principal Frances De Sanctis regarding what Student A had told

Ms. Mottola, and Principal De Sanctis immediately called the

Office of the Special Commissioner of Investigation for the New

York City School District ("SCI") to report what Ms. Mottola had

told her.  (*Id.* ¶¶ 22-23.)  Ms. Mottola and Principal De Sanctis

stated in their depositions that they never had any suspicion

that there was an inappropriate relationship between Ms. Doe and

Mr. Benavides prior to the conversation with Student A.  (ECF No.

103-4, Transcript of Deposition of Raffaella Mottola dated June

3, 2009 ("Mottola Dep. Tr.") at 42-44, 51, 60; ECF No. 103-5,

Transcript of Deposition of Frances De Sanctis dated June 2, 2009

("De Sanctis Dep. Tr.") at 45, 49.)

On Thursday, June 7, 2007, based on the intake

complaint from Principal De Sanctis that Ms. Mottola had informed

her that Mr. Benavides and Ms. Doe were "together" and in

"inappropriate relations," SCI Investigator Andre Jenkins

contacted Principal De Sanctis to schedule interviews that he and

another investigator would perform at the school the next day.

(City 56.1 Stmt. ¶¶ 24-25; Transcript of Deposition of Andrew

Jenkins dated November 30, 2009 (attached as Exhibit B to Pls.

11

Decl.) ("Jenkins Dep. Tr.") at 27-28, 33-35.)[3]   On Friday, June

8, 2007, Investigator Jenkins interviewed Ms. Doe, Mr. Benavides,

Principal De Sanctis, Ms. Mottola, Student A, and two other

students at Richmond Hill.[4]  (City 56.1 Stmt. ¶ 26; Jenkins Dep.

Tr. at 27-28.)   Although Ms. Doe initially denied having a sexual

relationship with Mr. Benavides during her interview with

Investigator Jenkins, Ms. Doe ultimately admitted it.   (City 56.1

Stmt. ¶ 28.)   Mr. Benavides also admitted to having a sexual

relationship with Ms. Doe during his interview with Investigator

Jenkins.   (Jenkins Dep. Tr. at 49-50.)   Based on the information

he learned from the interviews on June 8, Investigator Jenkins

concluded that Mr. Benavides and Ms. Doe were involved in an

illegal sexual relationship.   (City 56.1 Stmt. ¶ 27.)   On the

same day, after the interviews took place, plaintiff Pilar

Romero, Ms. Doe's mother, was informed at a meeting at the school

of the illegal sexual relationship between her daughter and Mr.

Benavides.   (*Id.* ¶ 29.)   Ms. Doe had not previously informed her

mother about the relationship.   (04/29/09 Doe Dep. Tr. at 57.)

Further, on June 8, 2007, after the SCI interviews had

concluded, Principal De Sanctis ordered the removal of Mr.

---

[3]   During Mr. Jenkins' deposition, Mr. Benavides represented on
the record that the school was closed on June 7, 2007, but this representation
was not under oath and is not considered in the court's analysis.   (Jenkins
Dep. Tr. at 91.)

[4]   Other than Ms. Doe and Student A, no evidence was presented to
the court regarding the other two students interviewed by Investigator
Jenkins.

Benavides from all of his teaching responsibilities at Richmond
Hill.  By the following Monday, June 11, 2007, another teacher
had taken over teaching Mr. Benavides' classes.  (City 56.1 Stmt.
¶¶ 31-32.)  Mr. Benavides was transferred to a regional NYCDOE
reassignment center at which he had no interaction with children
as a teacher[5]; and he did not teach another NYCDOE class or
return to Richmond Hill after June 8, 2007.  (*Id.* ¶ 33-35.)
Finally, Mr. Benavides was officially terminated from his
position as a NYCDOE teacher in or around December 2007.  (*Id.*
¶ 36.)

> After the interviews, on June 8, 2007, Investigator
Jenkins called his supervisors and advised them of what he had
learned, and he was instructed "not to do anything" at that
moment because the matter would be decided at a later date.  (*Id.*
¶ 37; Pls. City 56.1 Stmt. ¶ 37; Jenkins Dep. Tr. at 52, 59-61.)[6]
Between June 8 and June 13, 2007, there is no evidence or any

---

[5]  Although plaintiffs dispute whether Mr. Benavides had
interactions with children after June 8, 2007, citing Ms. Doe's testimony that
she and Mr. Benavides saw each other on at least three separate occasions
after June 8, 2007 (*see* Pls. City 56.1 Stmt. ¶ 33), there is no evidence in
the record that Mr. Benavides interacted with Ms. Doe or other children at the
reassignment center to which he was transferred or any other NYCDOE facility.
To the contrary, Ms. Doe's testimony establishes that they saw each other
after June 8, 2007 at locations other than the reassignment center, including
near Ms. Doe's house, a friend's house, a hair salon, and an airport.
(04/29/09 Doe Dep. Tr. at 46-49; *see* City Defs. Reply at 7-8.)

[6]  Investigator Jenkins further testified at his deposition that
he did not arrest Mr. Benavides on June 8, 2007 after he confessed to having
sexual intercourse with Ms. Doe - an underage girl - because Investigator
Jenkins "would never effect an arrest during the course of an investigation
without consulting with [his] supervisors."  (Jenkins Dep. Tr. at 66.)

assertion that Ms. Doe and Mr. Benavides saw or spoke to one another.  After June 8, 2007, Investigator Jenkins continued to gather evidence regarding his investigation by subpoenaing the appropriate telephone records.  (City 56.1 Stmt. ¶ 38; Jenkins Dep. Tr. at 51.)  He collected this additional evidence to corroborate his conclusion that there was an illegal sexual relationship between Mr. Benavides and Ms. Doe and to ensure that the government had as much evidence as possible in the event that a criminal court excluded certain evidence.  (City 56.1 Stmt. ¶ 39.)  Other than his interviews of Principal De Sanctis, Ms. Mottola, and Mr. Benavides on June 8, 2007, Investigator Jenkins did not conduct any additional interviews of teachers, security officers, or other staff at Richmond Hill because he "didn't think it was necessary" as school staff members and security personnel are mandated to report any suspicious behavior observed.  (Pls. City 56.1 Stmt. ¶ 39; Jenkins Dep. Tr. at 77-78.)

On June 13, 2007, pursuant to his power to arrest the subject of his investigation under N.Y. Crim. Proc. Law §§ 2.10(27), 2.20(1)(a), 140.25(1)(b) and New York City Administrative Code § 14-106(e), Investigator Jenkins arrested Mr. Benavides, and he was charged with Rape in the Second Degree, Criminal Sexual Acts in the Second Degree, and Endangering the Welfare of a Child.  (City 56.1 Stmt. ¶¶ 40, 42, 48; Jenkins Dep.

Tr. at 22.)  The Criminal Court of the City of New York in Queens County also entered an Order of Protection on June 13, 2007, prohibiting Mr. Benavides from having any contact with Ms. Doe or visiting her home or school. (*See* ECF 103-7, Statement of Investigator Jenkins to the New York State Criminal Court, Queens County, dated October 17, 2007 ("Jenkins Stmt.").)  After he was arrested and released on bail, Mr. Benavides saw Ms. Doe on four occasions on three distinct days, thereby violating the terms of the Order of Protection.  (City 56.1 Stmt. ¶ 48.)  Mr. Benavides saw Ms. Doe on these four occasions at locations not associated with the NYCDOE, including near Ms. Doe's house, outside a hair salon, at a friend's house, and at a Starbucks at LaGuardia Airport, the last of which meeting occurred on July 6, 2007. (*Id.* ¶ 49; Pls. City 56.1 Stmt. ¶ 49; *see also* 04/29/09 Doe Dep. Tr. at 46-49; Jenkins Stmt.)  As a result of the violation of the Order of Protection, Investigator Jenkins arrested Mr. Benavides a second time.  (City 56.1 Stmt. ¶ 50.)  Mr. Benavides subsequently pleaded guilty to a statutory rape charge and served a prison term beginning in or around December 2007 and ending in a parole release in November 2009.  (*Id.* ¶ 51.)

SCI generally contacts the New York City Police Department (the "NYPD") if the initial complaint of wrongful conduct to SCI suggests that criminal activity may be occurring, and the NYPD will then determine whether it will conduct the

15

investigation.  (*Id.* ¶ 43; *see also* Jenkins Dep. Tr. at 56 ("[I]f
there's an allegation made, and there's a clear indication [of] a
sexual relationship between a [NYCDOE] employee and any male or
female under the age of seventeen, we automatically refer that
case to the [NYPD].").)  Where, as in the instant case, the
initial complaint to SCI does not necessarily allege conduct that
would constitute a crime but SCI later determines that a crime
has been committed during the course of its investigation, SCI
has the discretion to handle the investigation and effect the
arrest.  (City 56.1 Stmt. ¶ 44-45; Jenkins Dep. Tr. at 56-60.)
Here, the classification of the initial complaint, based on the
information reported to SCI intake over the phone by Principal De
Sanctis on June 6, 2007, was an "inappropriate relationship," a
non-criminal classification, rather than a criminal
classification such as "rape" or "sexual relationship."[7]
Consequently, SCI conducted the investigation and effected the
arrest after determining that Mr. Benavides was involved in an
illegal sexual relationship, rather than referring the case to

---

[7]  The allegation in the initial complaint states that "the
principal is informed by the teacher Raffaella Mottola, that the subject, who
is Julio Benavides, and [Jane Doe] are together."  (Jenkins Dep. Tr. at 33.)
When asked whether the classification of "inappropriate relationship" could
include a sexual relationship, Investigator Jenkins testified that there are
separate classifications for "sexual relationship" and "rape" that would be
used where appropriate.  (*Id.* at 34, 37.)  The classification of the case was
changed to "rape, less than seventeen" in Investigator Jenkins' final report.
(*Id.* at 38-39.)

the NYPD.  (City 56.1 Stmt. ¶ 46; Jenkins Dep. Tr. at 33-34, 57-58.)

Plaintiffs appear to dispute the City Defendants' assertions that they would have referred the case to the NYPD if the initial intake complaint was classified as criminal, citing testimony by Investigator Jenkins in which he states that, when he called his supervisors following the interviews on June 8, 2006 regarding the case, "there would not have been any discussion about calling the police, because we have arrest powers, and at [that] time, if it was decided to do an arrest at whatever point, we were going to do it."  (Pls. City 56.1 Stmt. ¶¶ 43-44 (citing Jenkins Dep. Tr. at 66).)  Plaintiffs do not dispute, however, that SCI generally does not contact the NYPD when an active investigation ultimately reveals that a crime has been committed.  (City 56.1 Stmt. ¶ 47; Pls. City 56.1 Stmt. ¶ 47.)  There is no evidence that plaintiff Pilar Romero was prevented by defendants from calling the police at any time after she learned of her daughter's illegal relationship sexual relationship on June 8, 2007.

## DISCUSSION

I.  **Summary Judgment Standard**

The court shall grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (citation omitted). Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Id.* Nevertheless, the

nonmoving party may not rest merely on allegations or denials but must instead set out specific facts, supported by admissible evidence, showing a genuine issue for trial. *See id.* ("To defeat a summary judgment motion, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." (citations omitted)).

II.  **Application**

    A.  **Claims Against the City and Dismissal of Claims Against SCI, a Non-Suable Entity**

         Before reaching the substance of defendants' motions for summary judgment, the court notes that the NYCDOE[8] is a separate legal entity from the City and "the City cannot be liable for the acts of [the NYCDOE] or its employees." *Chapman v. City of New York*, No. 06-CV-3153(ENV)(JMA), 2011 U.S. Dist. LEXIS 34221, at *13-16 (E.D.N.Y. Mar. 25, 2011) (quoting *Moore v. City of New York*, No. 08 Civ. 8879, 2010 U.S. Dist. LEXIS 19183, at *15-16 (S.D.N.Y. Mar. 2, 2010)); *Fierro v. City of New York*, 591 F. Supp. 2d 431, 446 (S.D.N.Y. 2008) ("Courts in this circuit

---

    [8]  Although plaintiffs properly named the NYCDOE in their complaint, they refer to the NYCDOE as the "New York City Board of Education" or "NYCBE" in other portions of the complaint and in their submissions in connection with the summary judgment motions.  Prior to the commencement of this action, however, "[t]he Board of Education of the City of New York has been reorganized and renamed the New York City Department of Education." *Bronx Household of Faith v. Bd. of Educ.*, 650 F.3d 30, 32 n.1 (2d Cir. 2011); *Valtchev v. City of New York*, 400 Fed. App'x 586, 589 n.2 (2d Cir.  2010) ("The Board of Education became the Department of Education in 2002.").

as well as the New York State courts have made clear that the
City of New York and the [NYCDOE] are separate legal entities. .
. .  Because plaintiff alleges acts committed by the [NYCDOE] and
its employees, the City of New York is not a proper party.");
*Linder v. City of New York*, 263 F. Supp. 2d 585, 590 (E.D.N.Y.
2003) (dismissing claims against the City because "the [NYCDOE]
is an entity separate from the City itself and the City is not
liable for torts committed by [the NYCDOE]." (citation omitted)).

Moreover, there is no dispute that Principal De
Sanctis, Assistant Principal Himonides, Ms. Mottola, Mr.
Benavides, and all other employees who worked at Richmond Hill
that are relevant to this case are or were NYCDOE employees and
were never directly employed by the City during the relevant
period.  Indeed, plaintiffs do not make any allegations against
the City that are separate and distinct from those against the
NYCDOE and SCI, and there are no City officials or agents
mentioned in the record other than those affiliated with the
NYCDOE and SCI.  Accordingly, to the extent claims against the
City are predicated on the acts and omissions of the NYCDOE or
its employees, such claims are dismissed as a matter of law.

The City is, however, the appropriate entity to be sued
for the acts of the New York City Department of Investigation
(the "DOI") and its subdivision SCI and their respective
employees because the DOI and SCI are not suable entities.  *See*

20

*Morris v. Katz*, No. 11-CV-3556 (JG), 2011 U.S. Dist. LEXIS 100961, at *15-16 (E.D.N.Y. Sept. 4, 2011) (finding that the "DOI . . . as [an agency] of the City of New York, lack[s] independent legal existence and cannot be sued" (citing N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the [C]ity of New York and not in that of any agency, except where otherwise provided by law."))); *Siino v. Dep't of Educ. of the City of N.Y.*, 843 N.Y.S.2d 828, 829 (N.Y. App. Div. 1st Dep't 2007) (finding that the DOI is not properly named a defendant (citing N.Y.C. Charter § 396)); *see also Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008) (noting that "Section 396 of the [New York City] Charter has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity to be sued." (citing *Jenkins v. City of New York,* 478 F.3d 76, 93 n.19 (2d Cir. 2007)).  Accordingly, while the court will continue to refer to SCI for the purposes of this opinion, any claims against SCI shall be dismissed because all such claims are properly brought against the City, which is already a named defendant.  *See Alleva v. New York City Dep't of Investigation*, 696 F. Supp. 2d 273, 276 n.2 (E.D.N.Y. 2010) ("When claims 'are brought against non-suable entities,' the Court may construe them 'as brought against the City of New York.'" (citation omitted)).

**B.** **Sex Discrimination in Violation of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681)**

Plaintiffs claim that all defendants engaged in sex discrimination against Ms. Doe in violation of Title IX of the Education Amendments of 1972, codified as 20 U.S.C. §§ 1681 *et seq.* ("Title IX").  Section 901(a) of Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX thus prohibits discrimination against any student based on gender in educational programs receiving federal funding.  The Supreme Court has recognized an implied private right of action under Title IX for which both injunctive relief and damages are available.  *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (citations omitted).

As an initial matter, plaintiff Pilar Romero cannot recover on any derivative claim under Title IX or Section 1983, as there is no allegation or evidence that she was subjected to discrimination under a federally funded education program, nor that her civil rights were violated.  *See Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 7:06-cv-15509 (WWE), 2011 U.S. Dist. LEXIS 35485, at *8 (S.D.N.Y. Mar. 24, 2011) (finding that father of a student victim of sexual assault by a teacher "cannot recover on

any derivative claim based on Title IX or a section 1983 civil
rights violation"); *Zamora v. N. Salem Cent. Sch. Dist.*, 414 F.
Supp. 2d 418, 427 (S.D.N.Y. 2006) (finding that the mother of a
fifth-grade student who was the victim of sexual harassment by a
teacher cannot sustain derivative claims based on Title IX or
Section 1983).  Although Ms. Romero initiated this action when
Ms. Doe was still a minor and was a proper party as mother and
natural guardian of Ms. Doe, she asserts no independent federal
claims.  Moreover, Ms. Doe is now of legal age to be substituted
as the real party in interest, as provided by Federal Rule of
Civil Procedure 17(a).  *See Advanced Magnetics, Inc. v. Bayfront
Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997) ("A Rule 17(a)
substitution of plaintiffs should be liberally allowed when the
change is merely formal and in no way alters the original
complaint's factual allegations as to the events or the
participants.").  Accordingly, plaintiff Pilar Romero's claims
pursuant to Title IX and Section 1983 are dismissed, and Jane Doe
is substituted as the real party in interest.

        The court will next address plaintiff Jane Doe's claims
under Title IX against each defendant in turn.

        **1.   The NYCDOE**

        Title IX prohibits sex discrimination "under any
education program or activity receiving Federal financial
assistance," 20 U.S.C. § 1681(a), and thus "allows a student to

assert a private cause of action against the recipient of the federal funding for the denial of access to education." *Miotto v. Yonkers Pub. Schs.*, 534 F. Supp. 2d 422, 426 (S.D.N.Y. 2008). It is undisputed that the NYCDOE receives federal funding for Title IX purposes and that it is properly named a defendant. (*See* Compl. ¶¶ 3-4).

The Supreme Court has squarely addressed the issue of whether institutional actors such as the NYCDOE can be liable for damages under Title IX where a teacher sexually harasses a student. In *Franklin* v. *Gwinnett County Public Schools,* 503 U.S. 60 (1992), the Supreme Court held that a school district can be held liable in damages under Title IX in cases involving a teacher's sexual harassment of a student. *Id.* at 74-75.

Subsequently, in a case very similar to this one, the Supreme Court defined the contours of institutional liability in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), where a teacher had a sexual relationship with an eighth-grade student that was not reported to school officials and the student sued the school district under Title IX. *Id.* at 277-78. The Court held, with respect to the school district, that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs

and fails adequately to respond." *Id.* at 290.  In elaborating on what amounts to a failure to adequately respond, the Supreme Court held that the response must amount to "deliberate indifference" - or "an official decision by the recipient not to remedy the violation." *Id.* at 290-91.

One year after *Gebser*, in *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), the Supreme Court extended damages liability for Title IX funding recipients to cases of student-on-student harassment, but only where the Title IX recipient acted with actual knowledge of acts of harassment and with deliberate indifference. The *Davis* Court elaborated on its decision in *Gebser*:

> [In *Gebser*], we rejected the use of agency principles to
> impute liability to the district for the misconduct of
> its teachers.  Likewise, we declined the invitation to
> impose liability under what amounted to a negligence
> standard - holding the district liable for its failure
> to react to teacher-student harassment of which it knew
> or *should have known*.  Rather, we concluded that the
> district could be liable for damages only where the
> district itself intentionally acted in clear violation
> of Title IX by remaining deliberately indifferent to
> acts of teacher-student harassment of which it had
> actual knowledge. . . . [T]he misconduct of the teacher
> in *Gebser* was not 'treated as the grant recipient's
> actions.'  Liability arose, rather, from 'an official
> decision by the recipient not to remedy the violation.'
> By employing the 'deliberate indifference' theory . . .,
> we concluded in *Gebser* that recipients could be liable
> in damages only where their own deliberate indifference
> effectively 'cause[d]' the discrimination.  The high
> standard imposed in *Gebser* sought to eliminate any 'risk
> that the recipient would be liable in damages not for
> its own official decision but instead for its employees'
> independent actions.'"

*Id.* at 642-43 (internal citations omitted).  The Court also stressed that its decision does not require that school administrators engage in any particular disciplinary action and that "administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' . . . *only where* the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648 (emphasis added).

The court will now address the two requirements of *Gebser*, actual knowledge and deliberate indifference, in the context of the NYCDOE's summary judgment motion.

a.   *Actual Knowledge*

As established by *Gebser,* for an educational institution to be liable under Title IX, "the plaintiff must establish that a school official with 'authority to address the alleged discrimination and to institute corrective measures' had 'actual knowledge' of the discrimination . . . ." *Papelino v. Albany College of Pharm. of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (quoting *Gebser*, 524 U.S. at 290). The Second Circuit has stated that "[r]equiring actual, as opposed to constructive, knowledge [of the alleged sexual harassment] imposes a greater evidentiary burden on a Title

26

IX claimant [than a Title VII claimant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750 (2d Cir. 2003).

Here, it is undisputed that Richmond Hill's Assistant Principal Himonides and Principal De Sanctis were informed of a possible relationship between Mr. Benavides and Ms. Doe on June 6, 2007, the same day Principal De Sanctis reported this information to SCI. (City 56.1 Stmt. ¶¶ 22-23; Pls. City 56.1 Stmt. ¶¶ 22-23.)  It is also not disputed that Assistant Principal Himonides and Principal De Sanctis lacked actual knowledge of an illegal sexual relationship between Mr. Benavides and Ms. Doe until June 8, 2007, after Investigator Jenkins conducted his interviews.  (*See* City 56.1 Stmt. ¶¶ 27, 31; Pls. City 56.1 Stmt. ¶¶ 27, 31.) Principal De Sanctis unquestionably had authority to, and actually did, address the alleged gender-based discrimination and institute remedial measures upon learning on June 8th that Mr. Benavides and Ms. Doe had an illegal sexual relationship, including removing Mr. Benavides from all of his teaching responsibilities and transferring him to a reassignment center. (*See* City 56.1 Stmt. ¶¶ 31-33.) Accordingly, the undisputed evidence in the record establishes that Assistant Principal Himonides and Principal De Sanctis had actual knowledge of a possibly inappropriate

relationship between Mr. Benavides and Ms. Doe on June 6,
2007, and of an illegal sexual relationship on June 8, 2007.

Unsupported by admissible evidence, plaintiffs
assert that Ms. Mottola knew of the relationship as early as
May 2007 – a month earlier.[9]  (Pls. City 56.1 Stmt. ¶¶ 16,
17, 20, 30.)  In support of their position, plaintiffs cite
only the deposition testimony of Ms. Doe in which she

_____

[9]  Although the Supreme Court has stated that "the knowledge of
the wrongdoer himself is not pertinent to the [actual knowledge] analysis,"
*Gebser*, 524 U.S. at 291, neither the Supreme Court nor the Second Circuit has
addressed whether a teacher, such as Ms. Mottola, who does not have
supervisory authority over the offending employee and cannot fire or suspend
the employee, is a "school official with authority to address the alleged
discrimination and to institute corrective measures," *id.* at 290; *see Karlen
v. Westport Bd. of Educ.*, No. 3:07-cv-309 (CFD), 2010 U.S. Dist. LEXIS 103490,
at *34 (D. Conn. Sept. 30, 2010) ("The case law has yet to precisely define
exactly who must be told about discrimination for a school board to have
'actual knowledge.'" (citations omitted)).  The cases decided by the Supreme
Court and the Second Circuit all allege actual knowledge by school
administrators such as principals or deans of colleges with clear supervisory
authority over the offending employee.  *See, e.g., Davis*, 526 U.S. at 634
(principal); *Gebser*, 524 U.S. at 291 (same); *Papelino*, 633 F.3d at 89 (dean of
college); *Hayut*, 352 F.3d at 751 (same); *see also T.Z. v. City of New York*,
635 F. Supp. 2d 152, 168 (E.D.N.Y. 2009) (finding that a teacher who was in
the room at the time of a sexual assault had the authority to take corrective
action to end the sexual assault if he knew it was occurring at the time).
There is also disagreement among other Circuit Courts of Appeals regarding
this issue.  *Compare Doe v. Sch. Bd.*, 604 F.3d 1248, 1255 (11th Cir. 2010)
("[T]he official with notice of the harassment must be 'high enough up the
chain-of-command that his acts constitute an official decision by the school
district itself not to remedy the misconduct.'" (citation omitted)), *with
Baynard v. Malone*, 268 F.3d 228, 243-244 (4th Cir. 2001) ("The appropriate
official's authority to 'institute corrective measures' does not have to
include the authority to suspend or fire.  As long as the official possesses
the ability and the duty to take meaningful steps toward stopping the abuse,
the official's deliberate indifference should translate into school board
liability under Title IX.").  Here, upon learning of a possibly inappropriate
relationship between Ms. Doe and Mr. Benavides on June 6, 2007, Ms. Mottola
immediately took meaningful steps to stop the possible discrimination by
informing the assistant principal of what she was told, but it appears that
Ms. Mottola did not have the authority to institute corrective measures, i.e.,
removing Mr. Benavides from his teaching responsibilities.  It is not
necessary to decide this issue, however, because the court does not find a
genuine dispute of fact with respect to Ms. Mottola's lack of knowledge prior
to June 6, 2007.

testified that her friends told her that another student told
Ms. Mottola about rumors "that something was happening"
between Ms. Doe and Mr. Benavides "[l]ike around May . . .
[o]r April 2007." (04/29/09 Doe Dep. Tr. at 22-23.) Ms. Doe
did not identify any of the students and there is no evidence
in the record as to the identities of the students and what
they did or did not report to a teacher as of April or May
2007. In her subsequent deposition, Ms. Doe testified that
Ms. Mottola knew of the relationship "probably a few days
prior [to June 6, 2007]. A month prior." (ECF No. 103-2,
Transcript of Deposition of Jane Doe dated January 14, 2010
("01/14/10 Doe Dep. Tr.") at 26.) Ms. Doe also testified,
however, that she "do[es] not know the exact date [Ms.
Mottola was told about the relationship] but I know she was
told." (*Id.* at 28.)

On the other hand, Ms. Mottola, on numerous
occasions in her deposition, flatly denied having any
knowledge, or even any suspicion, of a relationship between
Ms. Doe and Mr. Benavides prior to her conversation with
Student A on June 6, 2007. (Mottola Dep. Tr. at 42-44, 51,
60.) Ms. Doe's deposition testimony is vague at best,
describes multiple hearsay statements, and is "not
significantly probative." *Anderson*, 477 U.S. at 249-50. As
the only evidence in the record suggesting actual knowledge

29

by a NYCDOE official of any sort of sexual harassment or
inappropriate relationship prior to June 6, 2007, Ms. Doe's
testimony is insufficient to establish a genuine dispute of
material fact on the issue of actual knowledge "such that a
reasonable jury could return a verdict for the nonmoving
party."  *Id.* at 248.

  Moreover, even if Ms. Doe's deposition testimony
was unequivocal that Ms. Mottola was told about the
relationship prior to June 6, 2007, Ms. Doe has no personal
knowledge regarding what, when, and under what circumstances
an unidentified classmate told Ms. Mottola about the
relationship.  Rather, Ms. Doe only recounted rumors that she
heard from other unidentified students.  Accordingly,
plaintiff has thus failed to present admissible evidence
sufficient to establish a genuine dispute of fact as to
whether the NYCDOE had actual knowledge of an inappropriate
relationship between Ms. Doe and Mr. Benavides prior to June
6, 2007.  *See Major League Baseball Props., Inc. v. Salvino*,
Inc., 542 F.3d 290, 310 (2d Cir. 2008) ("In order to defeat a

properly supported summary judgment motion, the opposing
party must proffer admissible evidence . . . .").[10]

In light of the Supreme Court's clear rejection of
"an objective ('should have known') test for deliberate
indifference in the Title IX context," the Second Circuit has
recognized that "[i]t would be inappropriate to base finding
of discriminatory intent on a defendant's failure to respond
to circumstances that were not actually known to him, even if
he reasonably should have known." *Gant v. Wallingford Bd. of
Educ.*, 195 F.3d 134, 141 n.6 (2d Cir. 1999); *see also
Crandell v. New York College of Osteopathic Med.*, 87 F. Supp.
2d 304, 320 (S.D.N.Y. 2000) ("The institution at minimum must
have possessed enough knowledge of the harassment that it
reasonably could have responded with remedial measures to
address the kind of harassment upon which plaintiff's legal
claim is based.").

In *Tesoriero v. Syosset Cent. Sch. Dist.,* 382 F.
Supp. 2d 387 (E.D.N.Y. 2005), a Title IX case involving
sexual harassment by a male teacher of two female high school
students who were also sisters, the court discussed what kind
of notice is sufficient to satisfy *Gebser*'s actual knowledge

---

[10] For the same reason, Ms. Doe's deposition testimony that
other students told her that they had told one or two other teachers
whose names she could not recall about Ms. Doe's relationship with Mr.
Benavides is not sufficient to create a genuine dispute of fact. (*See*
04/29/09 Doe Dep. Tr. at 22, 40-43.)

standard.  After recognizing that "Title IX liability does
not attach simply because a school 'should have known' about
sexual abuse" and that "actual notice also requires more than
a simple report of inappropriate conduct by a teacher," the
court found "that, on the other hand, the actual notice
standard does not set the bar so high that a school district
is not put on notice until it receives a clearly credible
report of sexual abuse from the plaintiff-student." *Id.* at
397 (citations and quotation marks omitted).  The court
concluded that "[m]ost federal courts appear to agree that
the 'actual knowledge' need only be of facts indicating that
the teacher has *the potential* to abuse a student." *Id.*
(emphasis in original) (citation omitted).

        Pursuant to this standard, the court in *Tesoriero*
denied summary judgment finding a triable issue of fact as to
whether the school district had actual notice of the
teacher's potential to harass one of the students based on
the following "strong evidence" in the record:  (1) the
principal knew that the teacher had given the students gifts
such as body lotion, offered to tutor them for free,
telephoned their home, and attended their track meets; (2)
the principal had heard that the students' father had called
the teacher and demanded that he stop paying special
attention to his daughters; (3) the principal received a

32

credible report that another teacher had observed one of the
students and the offending teacher interacting in a manner
suggesting romantic involvement; and (4) the principal had
seen a letter from the offending teacher to one of the
students written in terms that were "over the line." *Id.* at
398.  There was also evidence in the record of a prior call
by the students' father to the assistant principal to discuss
his concerns regarding the teacher and of a meeting between
one of the students and the high school psychologist to
discuss the situation.  *Id.* at 391-92.

In contrast to *Tesoriero*, there are not sufficient
facts from which a reasonable jury could infer actual notice
of Mr. Benavides' sexual harassment or assault of Ms. Doe -
or even his potential to abuse a student - prior to June 6,
2007.  Other than Student A's conversation with Ms. Mottola
on June 6, 2007, there is no evidence in the record from an
individual with personal knowledge that any NYCDOE
administrator or employee observed or was told about a
possible relationship between Mr. Benavides and Ms. Doe.[11]

As described in detail above, it is undisputed that
Mr. Benavides and Ms. Doe employed extensive and elaborate

---

[11]  Although Ms. Doe testified that a teacher observed her and Mr.
Benavides in a stairwell where they had been kissing, the teacher did not
observe them kissing and Mr. Benavides had instructed Ms. Doe to separate if
they heard anyone in the stairwell.  (04/29/09 Doe Dep. Tr. at 20-21.)

measures to keep their relationship a secret and to avoid detection, including but not limited to communicating by computer and instant messenger after school hours, using "blocked" phone numbers, waiting until everyone, even the janitor, had left the school to kiss in Mr. Benavides' classroom, alternating the use of pay phones to call each other, and Ms. Doe traveling by taxi to a location several blocks away from Mr. Benavides' home. (*See* City 56.1 Stmt. ¶¶ 8-13, 18-19; 04/29/09 Doe Dep. Tr. at 8-10.)  Indeed, it is uncontested that, at Mr. Benavides' insistence, Ms. Doe did not tell a single person - including her friends or her mother - about any aspect of her relationship with Mr. Benavides until her interview with Investigator Jenkins, and Ms. Doe denied any rumors about their relationship by saying they were a "lie." (City 56.1 Stmt. ¶¶ 8-9, 15.)  Finally, the record is entirely devoid of any prior incidents or complaints of any sort regarding Mr. Benavides' teaching or his treatment of students.

Although plaintiffs do not cite to any evidence in the record other than Ms. Doe's testimony described above to support their claim of a genuine dispute of material fact as

required by Federal Rule of Civil Procedure 56(c)(1)[12], other

evidence in the record is not sufficient to have provided

actual notice to any NYCDOE officials of the possibility that

Mr. Benavides and Ms. Doe were having an illegal sexual

relationship prior to June 6, 2007.  First, although Ms. Doe

testified during her deposition that Mr. Benavides touched

and kissed her on the campus of Richmond Hill, she also

stated that they did not touch or kiss in the presence of

others, that she does not know of anyone who saw them touch

or kiss, and that they concealed their touching when others

were nearby - for instance, by holding hands under a table in

a secluded location in the library.  (04/29/09 Doe Dep. Tr.

at 13-22, 26-29.)  Second, the fact that Ms. Doe testified

that she and Mr. Benavides regularly walked together in the

hallway, ate lunch together, and sat together in the library

in plain view of students and staff (*id.* at 58-60) is not

sufficient to put any NYCDOE official on actual notice of

sexual harassment or assault.  *See Bliss*, 2011 U.S. Dist.

LEXIS 35485, at *16-17 ("[C]ourts have found that

discrepancies between the conduct that allegedly put the

---

[12]  Plaintiffs' contention, that "it is difficult to determine at
this time if the City Defendants had actual knowledge of the harassment before
June 8, since a proper police investigation involving the interviewing of
witnesses was never conducted," is unavailing.  (Pls. City Opp'n at 8.)
Plaintiffs had a complete and lengthy opportunity - over two years - to
conduct their own investigation and seek discovery pursuant to the Federal
Rules of Civil Procedure, and could have subpoenaed witnesses believed by
plaintiffs to have relevant evidence.  *See* Fed. R. Civ. P. 45.

administration on notice and the conduct ultimately at issue in the litigation must be sufficiently similar to find liability."). Third, the unspecified rumors circulating among students at Richmond Hill about a possible relationship between Mr. Benavides and Ms. Doe is not sufficient to constitute actual knowledge by school officials of sexual harassment, particularly where there is no evidence that any NYCDOE officials even heard the rumors.[13] *See Gonzalez v. Esparza*, No. 02 Civ. 4175 (SWK), 2003 U.S. Dist. LEXIS 13711, at *8-10 (S.D.N.Y. July 30, 2003) (granting motion to dismiss Title IX claim where plaintiff failed to allege that any school official had notice of the harassment by a teacher and the "first time plaintiff notified anyone at the school of his relationship with [the teacher] was on June 6, 2001, when plaintiff was questioned by [the principal] regarding rumors about plaintiff's relationship with [the teacher]."). Finally, Ms. Mottola's questioning of Ms. Doe about a

---

[13] Ms. Doe only testified that she "imagine[d] that someone had told [Ms. Mottola] something and that she had heard the rumors, the same rumors I had heard." (01/14/10 Doe Dep. Tr. at 27.) Ms. Mottola expressly denied hearing any such rumors. (Mottola Dep. Tr. at 42-43 ("Q: You never heard any other students talking about this rumor? A: No, I never did. And I have a pretty good ear in the school and I never heard these kids until the day [June 6, 2007] this child [Student A] came up to me. I was completely shocked and it was the first I ever heard and it was disturbing.").) Ms. Mottola's testimony is uncontroverted. Speculation by Ms. Doe about whether school officials heard rumors of her relationship with Mr. Benavides, without any personal knowledge that Ms. Mottola or any other teacher or official actually heard the rumors, is not sufficient to create a genuine dispute of fact as to whether school officials heard the rumor or had the requisite knowledge.

boyfriend on an unknown date in May 2007 also does not indicate actual knowledge of sexual harassment or assault by her. (01/14/10 Doe Dep. Tr. at 26-27); *see Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 624 (E.D.N.Y. 2011) (finding no genuine dispute of fact as to a school district's actual knowledge of harassment where "plaintiff herself testified that she did not . . . tell any other adult at the Seaford UFSD about the alleged harassment" and stated that "some of her teachers offered to assist her 'if [she] needed somebody to talk to or if [she] was upset,' which offers she did not accept . . . .").

While these facts together may be sufficient to establish a genuine dispute of fact as to whether the NYCDOE had constructive notice of an inappropriate relationship between Mr. Benavides and Ms. Doe prior to June 6, 2007, only actual notice is sufficient to establish liability under Title IX. *See Davis*, 526 U.S. at 642; *Hayut*, 352 F.3d at 750; *see also Tyrrell*, 792 F. Supp. 2d at 624 ("Absent any evidence sufficient to establish that defendants had actual knowledge of any such harassment, they cannot be liable under Title IX for their alleged deliberate indifference in responding to it.").

Accordingly, the court finds that the NYCDOE had actual notice of a possibly inappropriate relationship

between Mr. Benavides and Ms. Doe on June 6, 2007, and of an
illegal sexual relationship and the statutory rape of Ms. Doe
on June 8, 2007.  Viewing the record as a whole in the light
most favorable to the plaintiffs, the court finds that there
is no admissible evidence that any NYCDOE officials had
actual knowledge of any relationship prior to June 6, 2007,
and thus the NYCDOE could not have reasonably responded prior
to that date with remedial measures to address the kind of
harassment upon which plaintiffs' legal claims are based,
namely, sexual assault and statutory rape.  *See Crandell*, 87
F. Supp. 2d at 320 ("Clearly, the institution must have
actual knowledge of at least some incidents of harassment in
order for liability to attach, as this is the thrust of
*Gebser*.").  Indeed, absent knowledge of discrimination, the
NYCDOE is not required to undertake an investigation or
implement remedial measures for every instance of an
unsubstantiated rumor uttered *among students* about a
student's feelings for a teacher, or vice-versa, or when a
student and teacher are regularly observed walking together
in the hallway or sitting at the same table in the library.

        This finding is consistent with other courts that
have granted summary judgment on Title IX claims on similarly
tenuous facts by finding as a matter of law that the
defendants lacked actual notice or knowledge of the alleged

discrimination giving rise to plaintiff's claim.  *See, e.g.*,
*Gebser*, 524 U.S. at 291 (complaints from parents of other
students charging that teacher made inappropriate comments
during class were "plainly insufficient" to alert the
principal to the possibility of the teacher's sexual
relationship with a student); *Hayut*, 352 F.3d at 751 (finding
no evidence "suggesting that any of the [college officials]
had actual knowledge of [a professor's] conduct" during a
time when the professor made several inappropriate comments
with sexual overtones about a student during classes in front
of other students for the entirety of a semester and
plaintiff did not report the professor's conduct to college
officials at that time); *Tyrrell*, 792 F. Supp. 2d 601 at 625
("[P]laintiff claims student-on-student harassment consisting
of mere name-calling and teasing, of which there is no
evidence that defendants had actual notice except for [a
counselor's] knowledge of a few instances of name-calling by
unidentified students. . . . The only evidence of defendants'
actual notice of any alleged harassment of plaintiff by her
peers pertains to their knowledge that the pictures of the
April 1, 2005 [sexual act] were being displayed on a website
on the internet.  Since defendants did not have actual notice
. . . that the pictures of the April 1, 2005 incident were
being displayed on the Seaford UFSD computers . . . .,

plaintiff cannot establish a Title IX claim . . . ."); *T.Z. v. City of New York*, 635 F. Supp. 2d 152, 170 (E.D.N.Y. 2009) ("Plaintiff has demonstrated that the school was aware of past incidents of sexual assault in the school, but has failed to show that the school knew of any harassment inflicted upon [plaintiff] or by [her assailants]" where (1) there is no evidence in the record that plaintiff reported being subjected to sexual harassment on previous occasions, (2) plaintiff did not indicate to school administrators that she did not want to be in a class with her assailants, and (3) school officials did not witness any incidents involving plaintiff's assailants); *Doe v. Norwalk Cmty. Coll.*, No. 3:04-cv-1976 (JCH), 2007 U.S. Dist. LEXIS 51062, at *12 (D. Conn. July 16, 2007) ("[B]esides establishing . . . that [another] student charged [a teacher] with sexual misconduct, Doe has provided no evidence that [college officials] were aware of [the teacher's] behavior toward [the other student], apart from vague, inadmissible statements that [the student] had contacted NCC faculty after having had a nervous breakdown following [the teacher's] alleged assault. . . . Such vague assertions are insufficient to create a material issue of fact . . . ."); *see also DT v. Somers Cent. Sch. Dist.*, 588 F. Supp. 2d 485, 494 (S.D.N.Y. 2008) (finding no actual notice of racial harassment where (1) plaintiff

testified that he did not tell his mother or his teachers about racially derogatory comments and (2) the record was devoid of any evidence suggesting that anyone informed school officials of any facts regarding an incident of racial harassment), *aff'd*, 348 Fed. App'x 697 (2d Cir. 2009); *Barmore v. Aidala*, No. 04-CV-0445, 2006 U.S. Dist. LEXIS 46940, at *30 (N.D.N.Y July 12, 2006) ("Although school officials 'should have known' that J.P. had a history of racially offensive conduct and that some students used racial epithets in the school, there are no facts from which a reasonable fact finder could conclude that any of Defendants 'did know' that Plaintiff was being subjected to a racially hostile educational environment by J.P. or by anyone else.")

    b.    *Deliberate Indifference*

    A Title IX recipient "fails to adequately respond if it provides no response or if it provides a response that 'amount[s] to deliberate indifference to discrimination.'  The school's response to sex discrimination must be 'clearly unreasonable' in light of known circumstances." *Papelino*, 633 F.3d at 89 (quoting *Davis*, 526 U.S. at 648); *see also Hayut*, 352 F.3d at 751 ("Deliberate indifference may be found . . . when remedial action only follows after 'a lengthy and unjustified delay.'" (citation omitted)).  As recognized by the Second Circuit, "[c]learly unreasonable is not a mere 'reasonableness'

41

standard, and there is 'no reason why courts, on a motion . . . for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a matter of law.'" *DT*, 348 Fed. App'x at 700 (quoting *Davis*, 526 U.S. at 649).

Here, the facts regarding Principal De Sanctis' response to learning of the alleged relationship between Mr. Benavides and Ms. Doe are not disputed.  On June 6, 2007, the same day Student A informed Ms. Mottola about the relationship, Ms. Mottola informed Assistant Principal Himonides of the same and both Ms. Mottola and Assistant Principal Himonides relayed the information to Principal De Sanctis.  Upon obtaining the information, Principal De Sanctis immediately reported the possible relationship to SCI, a subdivision of the New York City Department of Investigation with arrest powers charged with investigating corruption, misconduct, and any kind of wrongdoing involving any person that works for the NYCDOE.  (City 56.1 Stmt. ¶ 23; Jenkins Dep. Tr. at 8.)  Then, on Friday, June 8, 2007, after Investigator Jenkins had interviewed Mr. Benavides, Ms. Doe, and others and had concluded that there was an illegal sexual relationship between Mr. Benavides and Ms. Doe, Ms. Doe's mother was informed about the relationship and Principal De Sanctis immediately removed Mr. Benavides from all of his teaching responsibilities at Richmond Hill and had him transferred to a NYCDOE reassignment center at which he had no

interaction with children.[14]   (City 56.1 Stmt. ¶¶ 31-32, 33-35.)

Following further investigation by Investigator Jenkins, Mr.

Benavides was subsequently arrested by Investigator Jenkins five

days later on June 13, 2007, and he was officially terminated

from his position as a NYCDOE teacher in or around December 2007.

(*Id.* ¶¶ 36-40.)   There is no evidence in the record that Mr.

Benavides and Ms. Doe had any contact between June 8, 2007 and

Mr. Benavides' arrest on June 13, 2007.   (*Id.* ¶ 41.)

     Based on the undisputed facts in the record, the court

finds as a matter of law that Principal De Sanctis' response to

learning of the alleged relationship between Mr. Benavides and

Ms. Doe did not amount to deliberate indifference because it was

not "clearly unreasonable" in light of known circumstances.   *See*

*Tesoriero*, 382 F. Supp. 2d at 399 ("The body of applicable case

law indicates that a principal receiving reports of possible

teacher-to-student sexual harassment does not act with deliberate

indifference where he or she promptly investigates, institutes

corrective measures, and subsequently continues to monitor the

situation.").   Upon learning of the relationship, Principal De

Sanctis immediately took steps to commence an investigation by

---

[14]   Plaintiffs surmise that "[i]t is not actually known whether or
not Mr. Benavides ever returned to Richmond Hill after June 8, 2007," (Pls.
City 56.1 Stmt. ¶ 35), but fail to cite to any evidence to dispute the
testimony of Principal De Sanctis, who stated that Mr. Benavides "never
returned" to the school again after June 8, 2007 (De Sanctis Dep. Tr. at 77).
Plaintiff's conclusory and speculative statements are not sufficient to create
a genuine dispute of material fact.

contacting SCI, a City agency charged with conducting investigations into precisely the type of inappropriate conduct reported here by Ms. Mottola, a NYCDOE employee.  When the investigation, which was conducted two days later, confirmed that there was in fact an illegal sexual relationship between Mr. Benavides and Ms. Doe, Principal De Sanctis immediately instituted remedial measures to protect Ms. Doe and other students by removing Mr. Benavides from the school, relieving him of his teaching responsibilities, and transferring him to a location at which he would not have any interaction with children.  Finally, Principal De Sanctis testified that due to these corrective measures, Mr. Benavides never returned to Richmond Hill or taught another NYCDOE class again (De Sanctis Dep. Tr. at 77-78, 87-88), and there is no evidence in the record to suggest otherwise.

The NYCDOE's response does not amount to deliberate indifference to discrimination, nor is it "an official decision . . . not to remedy the violation." *Gebser*, 524 U.S. at 290-91; *see Tyrrell*, 792 F. Supp. 2d at 626 (granting summary judgment on Title IX claim based on a finding that the school district did not act with deliberate indifference where a school counselor learned that pictures of an incident of a sexual nature involving a student had been posted on a website, and on the same day, the counselor (1) promptly notified the principal, (2) interviewed

the student and another student with knowledge of the incident, and (3) took steps to have the pictures removed from the website and to ensure that the website had not been accessed and could not be accessed from the school district's computers.)

Plaintiffs' arguments that the NYCDOE's response was "wholly inadequate" are meritless.  First, although the plaintiffs concede that Mr. Benavides was immediately transferred to a reassignment center, they argue that he should have been "immediately arrested, fired, or even suspended from his job, or reported to the police."  (Pls. City Opp'n at 11.)  Although Principal De Sanctis could have called the NYPD after learning of the illegal sexual relationship,[15] the plaintiffs have cited no authority for the proposition that, upon learning of criminal conduct, NYCDOE administrators have an affirmative duty to call the NYPD rather than rely on SCI's investigative and arrest authority.  Principal De Sanctis' decision to rely on SCI, a City entity with arrest powers specifically charged with investigating misconduct by NYCDOE employees, was not clearly unreasonable and did not subject Ms. Doe to further sexual assault or harassment as discussed below.  *See* Tyrrell, 792 F. Supp. 2d at 628 ("[D]efendants' purported failure to immediately alert

---

[15]  Ms. Doe's mother, Ms. Romero, also could have reported Mr. Benavides' conduct to the police after learning of the illegal sexual relationship the same day as the NYCDOE.

plaintiff's parents or 'the authorities' . . . does not establish a triable issue of fact because, *inter alia*, such failures did not subject plaintiff to harassment, or make her more vulnerable to it.  Indeed, plaintiff continued to be harassed even after her mother and the police were aware of the sexual assault and pictures.").  Furthermore, even if there were evidence that Mr. Benavides' employment with the NYCDOE could have been terminated immediately[16], Principal De Sanctis' immediate decision to remove him from his teaching responsibilities and transfer him to a reassignment center, where he would not have contact with children, was not clearly unreasonable and was adequate to protect Ms. Doe and other students from further harassment.

Second, plaintiffs' argument that the NYCDOE's response was inadequate because Mr. Benavides continued to have contact with Ms. Doe after he was arrested, released on bail, and subject to an order of protection, is without legal basis.  (Pls. City Opp'n at 11.)  It is undisputed that any interactions between Mr. Benavides and Ms. Doe occurred at locations not associated with Richmond Hill or the NYCDOE, including near Ms. Doe's house, outside of a hair salon, at Ms. Doe's friend's house, or at a Starbucks at LaGuardia Airport.  (City 56.1 Stmt. ¶ 49; Pls. City

---

[16]  There are no facts before the court regarding what administrative or grievance procedures are required prior to terminating a NYCDOE teacher, or whether Mr. Benavides was a member of a union, thereby requiring the NYCDOE to comply with certain procedures in a collective bargaining agreement prior to termination.

56.1 Stmt. ¶ 49; *see also* 04/29/09 Doe Dep. Tr. at 46-49; Jenkins Stmt.)  Because these interactions occurred at times and locations not under the control or supervision of the NYCDOE, it cannot be held liable for any damages caused by those interactions.  As the Supreme Court noted, "because the harassment must occur 'under' 'the operations of' a funding recipient . . . , the harassment must take place in a context subject to the school district's control."  *Davis*, 526 U.S. at 645; *Tyrrell*, 792 F. Supp. 2d at 626 ("[T]he liability of a recipient of federal funds is limited 'to circumstances wherein [it] exercises substantial control over both the harasser and the context in which the known harassment occurs.'" (quoting *Davis*, 526 U.S. at 645)).  The post-arrest contacts between Ms. Doe and Mr. Benavides did not occur in circumstances under the NYCDOE's control.

Moreover, there is no indication that the NYCDOE's actions or inactions "caused" Mr. Benavides and Ms. Doe to see each other after his arrest.  *See Davis*, 526 U.S. at 643. Indeed, plaintiff Pilar Romero was far better situated to prevent further contact between her daughter and Mr. Benavides.  Without basis in law or fact, plaintiffs instead speculate that the NYCDOE or SCI could have done more to prevent these interactions after Mr. Benavides had already been arrested, granted bail by a judge, and a protective order was put into place.  *See Tyrrell*,

792 F. Supp. 2d at 628; *see also Barmore*, 2006 U.S. Dist. LEXIS
46940 at *28 (finding that school officials were not deliberately
indifferent where "the undisputed facts reveal that each time
Plaintiff brought his complaints of racial harassment to the
attention of school administrators, an investigation was
conducted and, when presented by facts establishing racial
harassment, punishment was meted out.  While Plaintiff may not
have like the results that were reached . . . and while
Defendants' actions may not have stopped the harassment, that is
not the determinative issue."); *Yap v. Oceanside Union Free Sch.
Dist.*, 303 F. Supp. 2d 284, 295 (E.D.N.Y. 2004) ("Deliberate
indifference . . . requires something more than a proffer
indicating the ultimate inadequacy of preventative and curative
measures.  Instead, the measures taken must be so inadequate that
a degree of discriminatory intent may be inferred - allowing the
trier of fact to conclude that Defendants intended for the
discrimination to occur. . . . The ultimate failure of the
District's punitive and preventative measures do not alter the
fact that, in light of all of the attendant circumstances, the
actions taken were reasonable attempts to address the reported
problems." (citation omitted)).

     Finally, the plaintiffs complain that, after Ms. Romero
was informed about her daughter's illegal sexual relationship
with Mr. Benavides on June 8, 2007, the NYCDOE had no further

contact with her.  (Pls. City Opp'n at 11.)  Plaintiffs assert
that the NYCDOE should have helped Ms. Romero "deal with a
situation which would cause any parent extreme trauma" either
through counseling or other support.  (*Id.*)  Although the court
is sympathetic to Ms. Romero's situation and understands her view
that the NYCDOE perhaps should have offered counseling services
to Ms. Romero and maintained regular contact with her after June
8, 2007, there is no evidence in the record that Ms. Romero ever
requested any such assistance.  Moreover, plaintiffs cite no
legal authority that the NYCDOE had a duty to provide outreach
and support to Ms. Romero.  Therefore, even assuming that Ms.
Romero could assert a Title IX claim on her own behalf, the
NYCDOE's failure to offer counseling and other services to Ms.
Romero in light of the other corrective measures taken to protect
Ms. Doe was not clearly unreasonable.  Even if Ms. Romero had
requested such services, the failure to provide services, by
itself, is not sufficient to constitute "an official decision by
the recipient not to remedy the violation." *Gebser*, 524 U.S. at
290.

       Based on the undisputed record before the court, the
NYCDOE's response to the sexual assault and harassment of which
they had actual notice was not deliberately indifferent as a
matter of law.  Accordingly, summary judgment is granted in favor
of the NYCDOE on the Title IX claim.

**2.   SCI**

The legal standards regarding actual notice and deliberate indifference described above apply equally to the analysis of whether plaintiffs can establish a Title IX claim against SCI as a matter of law.

A threshold issue is whether SCI is an "education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681.[17]  In addressing this issue, the Second Circuit considered *Grove City College v. Bell*, 465 U.S. 555 (1984), which predated the enactment of Section 1687 defining "program or activity."  The Second Circuit noted, "the Supreme Court considered the meaning of Title IX's phrase 'education program or activity' and defined it narrowly, holding that by referring to particular activities or programs, Congress intended that Title IX apply only to the particular program receiving financial assistance."  *O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997).  The Second Circuit then held that, because "education" modifies "program or activity" in 20 U.S.C. § 1681, "in order to implicate Title IX in the first instance, an entity must have features such that one could reasonably consider its mission to

---

[17] A "program or activity" is defined, *inter alia*, as "all of the operations of (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government."  20 U.S.C. § 1687.

be, at least in part, educational." *Id.*  For guidance in
interpreting this requirement, the Second Circuit considered a
Senate Report which provided the following example:  "If a
private hospital corporation is extended federal assistance for
its emergency rooms, . . . [s]ince Title IX is limited to
education programs or activities, it would only apply to the
students and employees of educational programs operated by the
hospital, if any." *Id.* at 118 (citation omitted).

     The Second Circuit went on to find that a state-run
clinic that receives federal money and permits student-interns
from a college with which it has no affiliation to perform
volunteer work at its facility is not subject to Title IX because
it does not conduct an "education program or activity." *Id.* at
117, 119.  In reaching this conclusion, the Second Circuit noted
that the clinic "maintains none of the characteristics associated
with being an educator" because it was not analogous to a
teaching hospital's "mixed employment-training context" and its
acceptance of volunteers was not "comparable to running an
educational or vocational program at a state correctional
facility, as such programs typically provide instructors,
evaluations, and offer a particular course of training." *Id.* at
118 (citations omitted).

     The City Defendants argue that SCI, a subdivision of
the DOI, is not subject to Title IX because both entities have a

51

"strictly investigative and law-enforcement purpose; neither entity has any educational component or purpose whatsoever." (City Defs. Mem. at 11).  In opposition, plaintiffs appear to argue that because SCI is an agent of the City, which operates educational programs or activities through the NYCDOE and receives federal funding, it is therefore subject to Title IX. (Pls. City Opp'n at 13.)  Plaintiffs' argument, however, is contrary to the Second Circuit's analysis of the private hospital in the *O'Connor* decision.  *See O'Connor*, 126 F.3d at 118.  Simply because the City receives federal funding and operates educational programs or activities does not mandate a finding that all of its various departments, like the DOI, and the subdivisions of those departments, like SCI, are subject to Title IX.  Rather, Title IX protects students and employees of educational programs that receive federal funding and are operated by the City.

The court finds persuasive the City Defendants' argument that SCI is not subject to Title IX liability.  SCI investigates corruption, misconduct, and wrongdoing involving any NYCDOE employee.  (Jenkins Dep. Tr. at 8.)  Notwithstanding SCI's investigative authority regarding the NYCDOE, there are no facts in the record to suggest that SCI's mission is, at least in part, educational, or that SCI receives Title IX funds.  Indeed, similar to the state-run clinic in *O'Connor*, SCI does not appear

to maintain any of "the characteristics associated with being an educator" because there is no evidence to suggest that it accepts tuition, provides instructors or evaluations, requires any hours, or offers a particular course of training. *See O'Connor*, 126 F.3d at 118. The limited connection that SCI has to education is that it investigates wrongdoing by NYCDOE employees, which is insufficient to support a finding that its mission is, at least in part, educational. *See Delgado v. Puerto Rican Family Inst., Inc.*, No. 97 Civ. 7122 (DAB), 2001 U.S. Dist. LEXIS 12699, at *13 n.5 (S.D.N.Y. Aug. 22, 2001) ("As there is no evidence nor any reason to believe that [Puerto Rican Family Institute]'s mission is in any way educational, Plaintiff cannot claim Title IX protection.").

Even if SCI were subject to Title IX, however, the court would grant summary judgment in favor of SCI. First, there is no dispute that SCI first learned of a possible relationship between Mr. Benavides and Ms. Doe on June 6, 2007, when Principal De Sanctis called SCI intake to report what Student A had told Ms. Mottola. SCI thus lacked actual knowledge of the possible relationship until June 6, 2007. Second, the court finds, based on the undisputed facts in the record, that SCI's response to this knowledge of a possibly inappropriate relationship did not amount to deliberate indifference. On June 7, 2007, the day after SCI received

actual notice of the relationship, Investigator Jenkins arranged for interviews of pertinent individuals with personal knowledge of the relationship the following day.  On Friday, June 8, 2007, after Investigator Jenkins conducted the interviews and concluded that there was an illegal sexual relationship between Mr. Benavides and Ms. Doe, he promptly notified Principal De Sanctis, Ms. Doe's mother, and his supervisors.  After Mr. Benavides had been relieved of his teaching duties and transferred to a NYCDOE reassignment center on June 8, 2007, Investigator Jenkins collected phone records over the course of the next five days to further corroborate the existence of an illegal sexual relationship between Mr. Benavides and Ms. Doe. Finally, Investigator Jenkins arrested Mr. Benavides pursuant to his arrest powers on June 13, 2007, after which Mr. Benavides was subsequently released on bail and subject to an order of protection.

On these undisputed facts, the court finds that SCI's response was not "an official decision . . . not to remedy the violation," *Gebser*, 524 U.S. at 290, and that its conduct was not "'clearly unreasonable' in light of known circumstances." *Papelino*, 633 F.3d at 89 (quoting *Davis*, 526 U.S. at 648). Plaintiffs' argument that SCI's response was inadequate relies primarily on Investigator Jenkins' failure to notify the NYPD or to arrest Mr. Benavides immediately upon learning of his illegal

sexual relationship with Ms. Doe on June 8, 2007.  (Pls. City
Opp'n at 4-6.)  Plaintiffs, however, have failed to cite any
authority establishing the affirmative duty of an SCI
investigator with investigative and arrest powers to notify the
police department or to make an immediate arrest upon learning
of criminal conduct.[18]  Even if SCI did notify the NYPD,
plaintiffs can only speculate whether the NYPD would have
effected Mr. Benavides' arrest and conducted its own
investigation differently than SCI, or whether the NYPD would
have deferred to SCI to handle the case.  (*See* City 56.1 Stmt.
¶ 43.)

          Moreover, the five-day period between SCI's actual
notice of an illegal sexual relationship and Mr. Benavides'
arrest cannot constitute "a lengthy and unjustified delay"
amounting to deliberate indifference, *Hayut*, 352 F.3d at 751,
particularly given that during this time Mr. Benavides had been
removed from Richmond Hill and all teaching responsibilities and
transferred to a NYCDOE reassignment center where he had no
contact with children, and Investigator Jenkins was collecting

---

          [18]  The court is not aware of any mandatory arrest provision under
New York law that would be applicable in this case.  *See* N.Y. Crim. P. Law
§ 140.10.  Moreover, there is "no constitutional right to have someone
arrested, absent a special relationship between him and the state," *Corbin v.
Stevens*, No. 91 Civ. 1054 (MJL), 1992 U.S. Dist. LEXIS 5950, at *8 (S.D.N.Y.
Apr. 28, 1992), and "there is no constitutional right to an investigation by
government officials," *Longi v. Cnty. of Suffolk*, No. CV-02-5821(SJF)(WDW),
2008 U.S. Dist. LEXIS 25468, at *22 (E.D.N.Y. Mar. 27, 2008).

evidence to corroborate the statements made during his

interviews.  Because there is no evidence that Mr. Benavides had

any contact with Ms. Doe between June 8 and June 13, 2007[19],

SCI's failure to notify the NYPD or to arrest Mr. Benavides on

June 8, 2011 did not subject Ms. Doe to further harassment or

make her more vulnerable to it.  *See* Tyrrell, 792 F. Supp. 2d at

628.  Indeed, a judge granted Mr. Benavides bail after he was

arrested on June 13, 2007, thereby indicating that Mr. Benavides

likely did not at that time pose a continued threat to Ms. Doe

or any other person.

     Nor did SCI's decision to wait five days to arrest Mr.

Benavides "cause" any further harm to Ms. Doe after June 13,

2007.  *See Davis*, 526 U.S. at 643.  There are no facts upon

which a jury could find SCI liable for Mr. Benavides'

persistence in contacting Ms. Doe after he had been arrested and

---

[19]  Although the plaintiffs agree with the City Defendants'
showing that Mr. Benavides and Ms. Doe saw each other on four occasions on
three distinct days *after* Mr. Benavides' arrest on June 13, 2007 (Pls. 56.1
Stmt. ¶ 48), plaintiffs contend elsewhere in their Local Rule 56.1 Statement
of Material Facts that Mr. Benavides contacted Ms. Doe several times after
June 8, 2007, and that, while Ms. Doe is not clear about the specific dates
such contact occurred, it "could have been between June 8 and June 13[, 2007]"
(Pls. 56.1 Stmt. ¶ 41).  The City Defendants correctly assert, however, that
there is no evidence in the record that Mr. Benavides had any contact with Ms.
Doe during the five-day period between June 8 and June 13, 2007.  (City 56.1
Stmt. ¶ 41.)  Investigator Jenkins' sworn statement to the City Criminal Court
in Queens in connection with Mr. Benavides' violation of the order of
protection entered on June 13, 2007 establishes that Mr. Benavides and Ms. Doe
saw each other on July 5 and July 6, 2007.  (Jenkins Stmt.)  Accordingly,
because plaintiffs fail to cite any evidence in the record — and there is none
— that Mr. Benavides and Ms. Doe interacted between June 8 and June 13, 2007,
their speculation that the two "could have" interacted during that time period
is insufficient to establish a genuine dispute of material fact regarding
SCI's lack of liability.

released on bail on June 13, 2007 and after an order of
protection had been entered prohibiting him from having any
contact with Ms. Doe.  (*See* Jenkins Stmt.)  Investigator Jenkins
arrested Mr. Benavides a second time for having contact with Ms.
Doe after June 13, 2007.  (City 56.1 Stmt. ¶ 50.)

    For the same reasons that the NYCDOE cannot be found
liable for contact between Mr. Benavides and Ms. Doe away from
school grounds after June 13, 2007 and for the failure to
provide counseling and other support to Ms. Romero, plaintiffs'
claims with respect to SCI must also fail.  Accordingly, because
plaintiffs cannot establish a Title IX claim against SCI as a
matter of law, the court grants SCI summary judgment on the
Title IX claim.

### 3.    Investigator Jenkins and Mr. Benavides

    Plaintiffs also bring Title IX claims against
Investigator Jenkins and Mr. Benavides as individuals.  The
Supreme Court has noted, however, that Title IX "has consistently
been interpreted as not authorizing suit against school
officials, teachers, and other individuals."  *Fitzgerald*, 555
U.S. at 257.  Indeed, "[n]umerous district courts in the Second
Circuit . . . have held that there is no individual liability
under Title IX."  *Miotto*, 534 F. Supp. 2d at 426 (collecting
cases); *see also Tesoriero*, 382 F. Supp. 2d at 396 (granting
summary judgment on Title IX claim in favor of individual

defendant because "the overwhelming majority of federal courts . . ., both in this Circuit and elsewhere, have held that only the *institutional recipient* of federal funds can be held liable under Title IX; individuals, who are not recipients, cannot be held liable." (emphasis added)(citations and quotation marks omitted)).

Accordingly, the court finds no reason to depart from the well-established authority that there is no individual liability under Title IX, and the court grants summary judgment in favor of Investigator Jenkins and Mr. Benavides on plaintiffs' Title IX claims.

## C.   42 U.S.C. § 1983 Claims

Plaintiffs bring claims against all defendants pursuant to 42 U.S.C. § 1983 for the alleged deprivation of Ms. Doe's constitutional rights to due process of law, equal protection, and to privacy.[20]  (Compl. ¶¶ 32-34; Pls. City Opp'n at 16.)  In relevant part, Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any

---

[20] In *Bruneau v. South Kortright Cent. Sch. Dist.*, 163 F.3d 749, (2d Cir. 1998), the Second Circuit held that a "§ 1983 claim based on the Equal Protection Clause is subsumed by Title IX." *Id.* at 758.  The Supreme Court, however, subsequently overruled this holding in 2009, concluding that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights.  Accordingly, we hold that § 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools." *Fitzgerald*, 555 U.S. at 258.

> State . . . subjects, or causes to be subjected,
> any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured
> by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . .
> . .

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal quotation marks and citation omitted).  To establish liability under Section 1983, a plaintiff must demonstrate that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution [and laws] of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

The court will first consider plaintiffs' Section 1983 claims against the City, the NYCDOE, and SCI (the "Municipal Defendants") and then will consider claims against Investigator Jenkins and Mr. Benavides in their individual capacities.

### 1.   The Municipal Defendants

"Municipal entities, including school districts, are 'persons' within the meaning of § 1983 and therefore subject to suit under that provision." *Nagle v. Marron*, 663 F.3d 100, 116

(2d Cir. 2011) (citing *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 663 (1978)).  Similar to claims against a school district under Title IX, however, "municipalities are not liable 'on a *respondeat superior* theory,' simply because an employee committed a tort.  Section 1983 'distinguish[es] acts of the *municipality* from acts of *employees* of the municipality,' and imposes liability only for 'action for which the municipality is actually responsible.'"  *Nagle*, 663 F.3d at 116 (citation omitted).  Thus, a municipality may be found liable under Section 1983 "only if 'the municipality *itself* causes the constitutional violation at issue.'"  *Davis*, 526 U.S. at 643 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

Pursuant to the Supreme Court's decision in *Monell*, the Municipal Defendants "cannot be found liable unless plaintiff can establish that an official policy or tolerance of a custom resulted in the deprivation of her rights.  A 'custom' for purposes of *Monell* liability must be 'so permanent and well settled as to constitute a custom or usage with the force of law.'"  *T.Z*, 635 F. Supp. 2d at 178 (citations omitted); *see also Nagle*, 663 F.3d at 116 ("The municipality is responsible if a violation of rights resulted from the 'government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" (citation omitted)).

60

Courts have recognized that the policy, custom, or practice prong of municipal liability can be established in four ways:  (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.  *Hernandez v. City of New York*, No. 00 Civ. 9507 (RWS), 2004 U.S. Dist. LEXIS 23365, at *12 (S.D.N.Y. Nov. 18, 2004).

To the extent plaintiffs are suing Investigator Jenkins and Mr. Benavides in their official capacities as agents of SCI and the NYCDOE respectively, plaintiffs must also show that they acted pursuant to an official policy or custom.  *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality - or an individual sued in his official capacity, the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom."  (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)); *Dwares v. City of New*

61

*York*, 985 F.2d 94, 100 (2d Cir. 1993) (noting that a plaintiff must offer "proof of . . . a [municipal] custom or policy in order to permit recovery on claims against individual municipal employees in their official capacities, since such claims are tantamount to claims against the municipality itself"), *overruled on other grounds by, Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

As the Municipal Defendants correctly point out, however, plaintiffs have failed to allege any facts in the Second Amended Complaint, or proffer any evidence in opposition to the instant motion, that the Municipal Defendants had an official policy or custom resulting in a deprivation of Ms. Doe's constitutional rights.[21] (*See* City Defs. Mem. at 15). Indeed, plaintiff's complaint merely makes legal allegations regarding the defendants' duties and liability, unsupported by any factual

---

[21] Plaintiffs allege that the NYCDOE failed to have a "student/grievance procedure in place for the lodging of sexual discrimination complaints," (Compl. ¶¶ 17-18), but there is no allegation that such failure was an official policy or custom or that such failure caused a violation of Ms. Doe's constitutional rights. More importantly, however, there are no facts in the record regarding the existence or non-existence of a "student/grievance procedure" and plaintiffs do not mention such procedures in their Local Rule 56.1 Statement of Material Facts or their submissions in connection with this motion.

allegations.[22] In response, plaintiffs argue that they "do not have to come under *Monell* conditions for municipal liability" because the Municipal Defendants' failure to involve the NYPD in Ms. Doe's case after they learned of the illegal sexual relationship and failure to follow up on Ms. Doe's condition violated Ms. Doe's constitutional rights by "creat[ing] the opportunity for Benavides to further assault Jane Doe after June 8, which would not have existed if the police and their ancillary services had been called in." (Pls. City Opp'n at 16.) To support this claim, plaintiffs invoke the "state-created danger" doctrine.[23]

The state-created danger doctrine is an exception to the general rule that a "[s]tate's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). In *Dwares*, the Second Circuit explained the state-created danger doctrine as follows: "a state actor may be subject to liability for an

---

[22] With respect to their Section 1983 claims, plaintiffs allege that the defendants had a "duty to provide and ensure an educational environment for [Ms. Doe] free of sexual assault, innuendo, intimidation and discriminatory animus and to enforce the regulations, rules, and laws necessary to protect [Ms. Doe] and other female students from acts of sexual abuse, including but not limited to bias, discrimination and rape." (Compl. ¶ 33.)

[23] To explain the "state-created danger" doctrine, plaintiff cites a case from a district court in the Third Circuit, *Nordo v. Sch. Dist. of Philadelphia*, 172 F. Supp. 2d 600, 602 (E.D. Pa. 2001). This court, however, will consider the abundant Second Circuit case law discussing this doctrine.

action physically undertaken by private actors in violation of
the plaintiff's liberty or property rights if the state actor
*directed or aided and abetted* the violation."  985 F.2d at 98
(emphasis added) (citations omitted); *see also Claudio v. Sawyer*,
409 Fed. App'x 464, 466 (2d Cir. 2011) ("The 'state-created
danger' doctrine holds government officials liable for private
harms if their 'affirmative conduct . . . communicates,
explicitly or implicitly, official sanction of private
violence.'" (quoting *Okin v. Vill. of Cornwall-on-Hudson Police
Dep't*, 577 F.3d 415, 429 (2d Cir. 2009)).  In applying the state-
created danger doctrine, the Second Circuit has "sought to tread
a fine line between conduct that is 'passive' (and therefore
outside the exception) and that which is 'affirmative' (and
therefore covered by the exception)."  *Matican v. City of New
York*, 524 F.3d 151, 157 (2d Cir. 2008).[24]  Accordingly, mere
allegations of a "failure to intercede" or that defendants "stood
by and did nothing" without affirmative acts, do not amount to a
state-created danger and are thus insufficient to state a

---

[24]  In explaining the difference between "passive" and
"affirmative" conduct, the Second Circuit has "found state-created dangers (or
denied summary judgment where state-created danger theories were alleged)
where police officers told skinheads that they would not prevent them from
beating up protesters in a park; where police officers gave a handgun to a
retired officer who then shot a fleeing robber; where a prison guard told
inmates that it was 'open season' on a prisoner, and the inmates beat up the
prisoner; and where police officials encouraged an off-duty colleague to drink
excessively, after which he killed three pedestrians in a car accident.  By
contrast, we held that no state-created danger existed where a police officer
failed to intervene to prevent a colleague from shooting someone during an
altercation."  *Matican*, 524 F.3d at 157 (citations omitted).

substantive due process claim.  *Pena v. Deprisco*, 432 F.3d 98, 110 (2d Cir. 2005).

Plaintiffs fail to point to a single affirmative act in the record by the Municipal Defendants that caused a violation of Ms. Doe's constitutional rights.  The Municipal Defendants' passive act of failing to inform the NYPD of the illegal sexual relationship on June 8, 2007, cannot be found to have aided, abetted, or encouraged Mr. Benavides to contact Ms. Doe after his arrest on June 13, 2007 in violation of an order of protection, and thus cannot support plaintiffs' assertion of a state-created danger.  *See Pena,* 432 F.3d at 110 ("A failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state *created* danger."); *Chambers v. N. Rockland Cent. Sch. Dist.,* No. 07-CV-8190 (KMK), 2011 U.S. Dist. LEXIS 109601, at *32-33 (S.D.N.Y. Sept. 27, 2011) (finding that defendants' alleged under-reporting of incidents of violent or disruptive behavior by students and failure to sufficiently punish or confront plaintiff's assailants despite complaints do not support claim of state-created danger).

Indeed, during the five days between June 8, 2007, when the Municipal Defendants learned of the illegal sexual relationship, and June 13, 2007, when Mr. Benavides was arrested, there is no evidence of contact between him and Ms. Doe.  Rather, as described above, the Municipal Defendants took immediate,

affirmative steps to investigate the complaint by Principal De
Sanctis and stop Mr. Benavides' sexual harassment and abuse of
Ms. Doe once they learned of it by immediately relieving him of
his teaching duties, removing him from Richmond Hill, and
subsequently arresting and charging him five days later.

Even if the failure to call law enforcement could be
defined as an "affirmative" act causing a deprivation of Ms.
Doe's rights, the court cannot find that the Municipal
Defendants' actions were "so egregious, so outrageous, that it
may fairly be said to shock the contemporary consciousness,"
which is required to impose liability on a Section 1983 claim
alleging a violation of one's substantive due process rights
pursuant to the state-created danger doctrine.  See Matican, 524
F.3d at 155; *T.K. v. New York City Dep't of Educ.*, 779 F. Supp.
2d 289, 315 (E.D.N.Y. 2011).

Notwithstanding plaintiffs' failure to allege any
official policy or custom in their complaint or present such
evidence, plaintiffs argue that SCI's policy or custom of not
automatically referring a case to law enforcement where the
*initial* complaint to SCI does not necessarily allege conduct that
would constitute a crime – as with the initial complaint in Ms.
Doe's case of an "inappropriate relationship" - satisfies the
requirements for *Monell* liability.  (*See* City 56.1 Stmt. ¶¶ 44-
45; Jenkins Dep. Tr. at 56-60.)  Assuming that SCI's policy

66

constitutes an official policy or custom under *Monell*,
plaintiffs' claim against SCI and the Municipal Defendants still
fails, however, because plaintiffs cannot establish that this
policy caused a violation of any of Ms. Doe's constitutional
rights.

First, as explained above, SCI's inaction cannot
constitute a violation of Ms. Doe's due process rights because
"the Due Process Clause of the Constitution does not require that
the state 'protect the life, liberty, and property of its
citizens against invasion by private actors,'" such as Mr.
Benavides acting in his individual capacity. *T.K.*, 779 F. Supp.
2d at 307 (quoting *Deshaney,* 489 U.S. at 195). There can be no
due process violation as a matter of law because the state-
created danger exception cannot be satisfied by the Municipal
Defendants' passive failure to act.

Second, in order to prevail on an equal protection
claim against the Municipal Defendants, plaintiffs must establish
that (1) Ms. Doe was treated differently than others similarly
situated by the Municipal Defendants, and (2) the differential
treatment was motivated by an intent to discriminate on the basis
of impermissible considerations, such as gender, to punish or
inhibit the exercise of constitutional rights, or by a malicious
or bad faith intent to injure the person. *Lovell v. Comsewogue
Sch. Dist.*, 214 F. Supp. 2d 319, 321-32 (E.D.N.Y. 2002) (citing

67

*Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). As a matter of law, plaintiffs' equal protection claim fails because plaintiffs have provided no evidence upon which a reasonable jury could conclude – nor have they even alleged – that the Municipal Defendants treated Ms. Doe differently than other similarly situated students, or that the Municipal Defendants were motivated by an intent to discriminate on the basis of any impermissible consideration, by a desire to punish or inhibit the exercise of Ms. Doe's constitutional rights, or by a malicious or bad faith intent to injure her.

Further, although the Second Circuit has recognized a constitutional right under the Equal Protection Clause of the Fourteenth Amendment "to an educational environment free of sexual harassment," *Bliss*, 2011 U.S. Dist. LEXIS 35485 at *21-22, there is no evidence in the record that SCI's policy of not immediately referring cases such as Ms. Doe's to the NYPD caused her to be subject to a hostile educational environment. Indeed, on June 8, 2007, the same day that SCI learned of the illegal sexual relationship between Mr. Benavides and Ms. Doe, it is undisputed that Mr. Benavides was removed from Richmond Hill and never taught another NYCDOE class again. Thus, there are no facts in the record to support a finding that Ms. Doe was subject to a hostile educational environment after the Municipal Defendants learned of the discriminatory acts of Mr. Benavides on

68

June 8, 2007.  Finally, to the extent plaintiffs claim that Ms. Doe's constitutional rights to equal protection under law were violated due to sexual harassment at the hands of Mr. Benavides, the court finds that their Section 1983 claim against the Municipal Defendants fails for the same reasons as plaintiffs' claims against the Municipal Defendants under Title IX.  *See R.S. v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 371 Fed. App'x 231, 234 (2d Cir. 2010) ("[T]o the extent plaintiffs' § 1983 claim sounds in sexual harassment, it fails for the same reason as their parallel claim under Title IX.").

The court summarily dismisses plaintiffs' constitutional claim of an alleged violation of plaintiffs' right to privacy.  Plaintiffs have not alleged, do not argue, and have not proferred any evidence establishing a deprivation of their right to privacy or how that right would be implicated in this case.  *See Matson v. Bd. of Educ. of the City Sch. Dist. of N.Y.*, 631 F.3d 57, 63-64 (2d Cir. 2011) ("As a general matter, 'there exists in the United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters.''" (citation omitted));  *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994) ("There is, therefore, a recognized constitutional right to privacy in personal information.").

Accordingly, because plaintiffs have failed to proffer any evidence establishing a genuine dispute of material fact as to whether an official policy or tolerance of a custom by the Municipal Defendants resulted in the deprivation of Ms. Doe's constitutional rights, summary judgment in favor of the Municipal Defendants, the City, the NYCDOE, and SCI, on plaintiffs' Section 1983 claims is granted. *See Bliss*, 2011 U.S. Dist. LEXIS 35485 at *23 (granting summary judgment in favor of school district where "Plaintiff has proffered no evidence of a school policy or custom that caused her to be subjected to a sexual assault.").

**2.   Investigator Jenkins**

It is unclear from the Second Amended Complaint whether plaintiffs intended to sue Investigator Jenkins in his individual and/or his official capacity.  Nevertheless, as noted above, because plaintiffs have failed to show that Investigator Jenkins or Mr. Benavides acted pursuant to an official policy or custom, any Section 1983 claim against them in their official capacities must be dismissed as a matter of law.  *See Patterson*, 375 F.3d at 226.

To the extent plaintiffs intended to bring a Section 1983 claim against Investigator Jenkins in his individual capacity, their claim also fails.  In order to survive a summary judgment motion on a Section 1983 claim against an individual defendant in his individual capacity, plaintiffs must proffer

70

evidence that (1) the defendant was acting under color of state law at the time he committed the conduct complained of, and (2) that the defendant's conduct deprived plaintiff of the rights, privileges or immunities secured by the Constitution or laws of the United States. *Hayut*, 352 F.3d at 743-44. In addition, "plaintiff must demonstrate a defendant's *personal* involvement in the alleged [constitutional violation]. . . ." *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-CV-977 (JFB)(MLO), 2010 U.S. Dist. LEXIS 10076, at *30 (E.D.N.Y. Feb. 5, 2010) (citing *Patterson*, 375 F.3d at 226).

"The Supreme Court has recognized that an individual is acting under color of state law when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* at 744 (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 317-18). Here, Investigator Jenkins undoubtedly was acting under color of state law during all of his conduct at issue, including his interviews at Richmond Hill, his gathering of the telephone records to corroborate the illegal sexual relationship, and his subsequent two arrests of Mr. Benavides.

The court finds, however, that any Section 1983 claim against Investigator Jenkins in both his official and individual capacity must fail for the same reasons that such claims fail against SCI and the Municipal Defendants. Indeed, plaintiffs'

71

claims against Investigator Jenkins rely on the same conduct as those against SCI and the Municipal Defendants – Investigator Jenkins' failure to immediately refer the case to law enforcement and the five-day delay between learning of the illegal sexual relationship and arresting Mr. Benavides, thereby causing a state-created danger.  (Pls. City Opp'n at 15-17.)  As described above, this conduct cannot be found to have caused a deprivation of Ms. Doe's constitutional rights as a matter of law, and plaintiffs have failed to proffer any evidence establishing a genuine dispute of material fact as to Investigator Jenkins' conduct.

In any event, plaintiffs have failed to show that Investigator Jenkins' conduct violated Ms. Doe's constitutional rights.  Nor is there a clearly established constitutional right of which a reasonable person would have known to have a City investigator with investigative and arrest powers immediately contact the police, or effect an arrest, upon learning of criminal conduct where there is limited potential and no actual imminent harm to the victim.  Consequently, Investigator Jenkins is entitled to qualified immunity with respect to any Section 1983 claim for such conduct.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have
known.'" (citation omitted)); *Dean v. Blumenthal*, 577 F.3d 60, 68
(2d Cir. 2009) ("In turning to our analysis of whether the
constitutional right at issue here was clearly established, we
may consider: (1) whether the right in question was defined with
'reasonable specificity'; (2) whether the decisional law of the
Supreme Court and the applicable circuit court support the
existence of the right in question; and (3) whether under
preexisting law a reasonable defendant official would have
understood that his or her acts were unlawful." (citation
omitted)); *Bliss*, 2011 U.S. Dist. LEXIS 35485 at *25-26
("Qualified immunity applies if the official's mistake as to what
the law requires is reasonable.  It does not apply if, on an
objective basis, it is obvious that no reasonably competent
official would have taken the actions of the alleged violation.
Summary judgment is appropriate when a trier of fact would find
that reasonable officials could disagree." (citations omitted)).
Even if reasonable officials could disagree as to whether
Investigator Jenkins' response was appropriate, qualified
immunity applies and summary is granted in favor of Investigator
Jenkins on plaintiffs' Section 1983 claim.

### 3.  Mr. Benavides

The court will first address whether Mr. Benavides was
acting under color of state law with respect to his illegal

sexual relationship with Ms. Doe.  "The Supreme Court has
recognized that an individual is acting under color of state law
when exercising power 'possessed by virtue of state law and made
possible only because the wrongdoer is clothed with the authority
of state law.'"  *Hayut*, 552 F.3d at 744 (quoting *Polk Cnty.*, 454
at 317-18.)  "For purposes of a section 1983 action, a defendant
necessarily 'acts under color of state law when he abuses the
position given to him by the State.'"  *Id.* (quoting *West v.
Atkins*, 487 U.S. 42, 50 (1988)). "[G]enerally, a public employee
acts under color of state law while acting in his official
capacity or while exercising his responsibilities pursuant to
state law."  *West*, 487 U.S. at 50.  "Mere employment by a state
or municipality", however, "does not automatically mean that a
defendant's actions are taken under the color of state law."
*Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) (citing
*Polk Cnty.*, 454 U.S. at 319-20).

       In *Hayut*, the Second Circuit found it to be "clear"
that a professor employed at a state university who made several
inappropriate comments with sexual overtones about a female
student during his classes was a state actor.  352 F.3d at 744.
In reaching this conclusion, the Second Circuit stated that a
"professor at a state university is vested with a great deal of
authority over his students with respect to grades and academic
advancement by virtue of that position.  When a professor misuses

that authority in the course of performing his duties, he
necessarily acts under color of state law for purposes of a
section 1983 action."  In *Bliss*, where a teacher drugged a minor
female student on school grounds and sexually assaulted her, the
district court denied summary judgment on a Section 1983 claim
against the teacher because, "as the alleged tortfeasor, [the
teacher] was in a position to protect plaintiff from her
statutorily-protected right to be free of teacher-on-student
sexual assault."  2011 U.S. Dist. LEXIS 35485 at *23 (citing
*United States v. Giordano*, 442 F.3d 30, 47 (2d Cir. 2006)).

Mr. Benavides argues that his conduct with respect to
his illegal sexual relationship with Ms. Doe was not under color
of state law because his "personal relationship with Jane Doe
evolved from a normal teacher-pupil relationship, into a
friendship and eventually a romantic relationship, through the
continuous and extensive daily communication and interaction that
existed and took place outside of school premises and after
school hours . . . ."  (Benavides Mem. at 8.)  Although Mr.
Benavides concedes that he interacted with Ms. Doe on a daily
basis while performing his official duties and that some of his
official interactions with Ms. Doe may have caused her to develop
romantic feelings for him, he maintains that "anything that
happened between Jane Doe and I, be it sexual or otherwise" was
not "even remotely linked to a school activity" and that the two

75

of them always met "for the very specific purpose of spending time together as a couple." (*Id.* 9-10.)

In support of his position, Mr. Benavides cites several cases from outside of the Second Circuit involving sexual harassment and assault by school employees, co-workers, and police officers. (*Id.* at 9-15.) One of those cases, *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) (*en banc*), is particularly relevant to the facts of this case. In *Doe*, a high school teacher had an illegal sexual relationship with a freshman female student in his biology class and on the basketball team that he coached. The teacher began his seduction of the student by writing personal and suggestive comments on her homework and test papers, exchanging notes and telephone calls with her, giving her gifts, and by walking her to class and eating lunch with her and her friends. *Id.* at 447. The teacher also engaged in favoritism towards Doe, giving her high grades despite not requiring her to do classwork or take tests. *Id.* The relationship then became physical when the teacher took the student to a laboratory adjacent to his classroom and to the fieldhouse to engage in kissing and heavy petting, and subsequently the two began to have sexual contact both on and off school grounds. *Id.* at 447-48. The Fifth Circuit found that the teacher's actions were taken under color of state law because a "'real nexus' . . . between the activity out of which the

76

violation occur[ed] and the teacher's duties and obligations as a teacher" was "clearly present." *Id.* at 452 n.4 (citation omitted). In reaching this conclusion, the Fifth Circuit explained that the teacher "took full advantage of his position as Doe's teacher and coach to seduce her," pointing to facts that the teacher "required Doe to do little or no work in the classroom and still gave her A's," spoke to another teacher about raising Doe's grade in another class, and that the teacher kissed and petted Doe on school grounds. *Id.*

The court in *Doe* compared the facts of its case with *D.T. v. Indep. Sch. Dist.*, 894 F.2d 1176 (10th Cir. 1990), where a teacher sexually abused three minor students during the summer while engaged in a fundraising trip for a basketball camp that was not sponsored by the school. The Tenth Circuit in *D.T.* held that, although flyers had been circulated on school grounds regarding the camp and a basketball game had been played on school grounds to raise money for the camp, the sexual misconduct had not occurred under color of state law because (1) the fundraising trip occurred during the summer vacation period when the teacher had "no duties or obligations owing to or functions to perform for the School District" and (2) the principal had made it clear to the teacher that "any and all activities associated with summer basketball camps were not school related." *Id.* at 1186-87; *see also Becerra v. Asher*, 105 F.3d 1042, 1047

(5th Cir. 1997) (finding that a teacher who sexually assaulted a student did not act under of color of state law, even where there was evidence that the teacher "had first befriended and shown a special interest in [the student] at school," because the assaults occurred at the student's home more than five months after the student withdrew from the school where the teacher taught and thus the teacher's contacts with the student "were in no way part of his duties as a state employee, were not school-sponsored, and were not reported to any school official.").

Here, unlike *D.T.* and *Becerra*, Mr. Benavides was Ms. Doe's mathematics teacher before and during the entirety of their illegal sexual relationship.  Similar to *Doe*, a reasonable jury could find that Mr. Benavides seduced Ms. Doe by misusing his position as her mathematics teacher.  Indeed, in one of their first personal interactions after class, Mr. Benavides talked to Ms. Doe about her classes, complimented her on her intelligence, and asked her to distribute papers and clean the blackboard, thereby causing her to spend more time in his presence. (04/29/12 Doe Dep. Tr. at 9.)  In class, Mr. Benavides and Ms. Doe would also "look at each other a lot."  (*Id.* at 9.)  In late October or early November, Mr. Benavides told Ms. Doe that he liked her, and she testified that "since he was my teacher, I believed him, and I trusted him."  (*Id.* at 10.)  She further testified, "since he was my teacher and I never had a boyfriend

or anything," she said, "yes, I would like to spend some time with you as well." (*Id.* at 10-11.)  When Mr. Benavides and Ms. Doe first started to speak, Ms. Doe testified, "he would tell me that it had to be a secret, never to tell anyone . . . [b]ecause he could get in a lot of trouble." (*Id.* at 12.)

Over subsequent months, there is evidence in the record that Mr. Benavides and Ms. Doe spent significant time together during the school day by regularly walking together in the hallway, having lunch together, and sitting together in the school library. (*Id.* at 36-37, 58-60.)  There is also evidence that Mr. Benavides touched and kissed Ms. Doe on the campus of Richmond Hill on several occasions, including in the stairway and in a classroom. (*Id.* at 13-22, 26-29.)  Although Mr. Benavides appears to argue that he only kissed Ms. Doe once on school grounds and that there was no sexual contact on school grounds (Benavides 56.1 Stmt. ¶¶ 12-13 (citing Jenkins Dep. Tr. at 96)), the court, in construing the facts in the light most favorable to the nonmoving party, must accept Ms. Doe's admissible testimony as true that Mr. Benavides "kissed [Ms. Doe] many times on the campus of Richmond Hill" (Pls. Benavides 56.1 Stmt. ¶ 12-13 (citing 04/29/11 Doe Dep. Tr. at 13)).  Moreover, Mr. Benavides further used his authority as a teacher to further his illicit relationship with Ms. Doe by asking her to "get a pass for certain times, like a hallway pass, to go to the bathroom, and to

meet him in different classrooms, at different times," starting
in November and continuing into June.  (04/29/11 Doe Dep. Tr. at
19).

Accordingly, although it is undisputed that from an
academic perspective Mr. Benavides did not treat Ms. Doe any
differently than other students in his class and that the two of
them did not have sexual intercourse on school grounds, the court
finds that a genuine dispute of material fact exists as to the
extent to which Mr. Benavides used his authority as a teacher to
initiate and escalate his relationship with Ms. Doe, and engage
in physical contact with Ms. Doe on school grounds.  Thus, a
reasonable jury could conclude that Mr. Benavides was acting
under color of state law during the course of his illegal sexual
relationship with Ms. Doe.

Even if he was acting under color of state of law, Mr.
Benavides argues that he did not violate any of Ms. Doe's
constitutional rights.  (Benavides Mem. at 16-20.)  The Second
Circuit has recognized, however, that "[i]t is incontrovertible
that bodily integrity is necessarily violated when a state actor
sexually abuses a schoolchild and that such misconduct deprives
the child of rights vouchsafed by the Fourteenth Amendment."
*Giordano*, 442 F.3d at 47 (quoting *Doe*, 15 F.3d at 451-52); *see*
*Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) ("The
substantive component of due process encompasses, among other

things, an individual's right to bodily integrity free from
unjustifiable government interference."); *Pabon v. Wright*, 459
F.3d 241, 253 (2d Cir. 2006) (noting that the Fourteenth
Amendment protects an individual's interest in bodily integrity);
*T.Z.*, 635 F. Supp. 2d at 177 ("The Second Circuit has recognized
a constitutional right to bodily integrity that is violated by a
sexual assault by a state actor." (citing *Giordano*, 442 F.3d at
47)).  As noted above, "[g]overnment action resulting in bodily
harm is not a substantive due process violation unless 'the
government action was 'so egregious, so outrageous, that it may
fairly be said to shock the contemporary conscience.''"
*Lombardi*, 485 F.3d at 79.

        The court finds that there are sufficient facts in the
record to support a finding that Mr. Benavides, as Ms. Doe's
mathematics teacher, violated her constitutional right to bodily
integrity by sexually assaulting and abusing her through an
illegal sexual relationship lasting over six months, to which
she, as a fourteen-year-old high school freshman, could not
legally consent, and that his conduct was so egregious and
outrageous as to shock the contemporary conscious.  *See Bliss*,
2011 U.S. Dist. LEXIS 35485 at *26 (denying summary judgment on a
Section 1983 claim against a teacher in his individual capacity
where a teacher sexually assaulted a student on a single occasion
on school grounds).  Additionally, there are sufficient facts in

the record for a jury to find that Mr. Benavides violated Ms.

Doe's "'constitutional right' under the Equal Protection Clause

'to an educational environment free of sexual harassment.'"

*Sauerhaft v. Bd. of Educ.*, No. 05 Civ. 09087 (PGG), 2009 U.S.

Dist. LEXIS 46196, at *23 (S.D.N.Y. June 1, 2009) (quoting

*Bruneau*, 163 F.3d at 758); *see Hayut*, 352 F.3d at 744-49

(describing elements of Section 1983 equal protection claim for

hostile educational environment in teacher-on-student harassment

case).  The court does not discern, the evidence in the record

does not support, and the plaintiffs have not adequately stated,

any other violations of Ms. Doe's constitutional rights.

Accordingly, summary judgment is denied as to the plaintiffs'

Section 1983 claim against Mr. Benavides in his individual

capacity for violations of Ms. Doe's constitutional rights to

bodily integrity and to an educational environment free of sexual

harassment.

### D.   Plaintiffs' State Law Claims

Plaintiffs' Second Amended Complaint alleges six state

law claims:  (1) intentional infliction of emotional distress

against the City and the NYCDOE (Count Three); (2) negligent

infliction of emotional distress against the City and the NYCDOE

(Count Four); (3) sexual harassment in violation of New York

State Human Rights Laws pursuant to New York Executive Law § 296

against all defendants (Count Five); (4) sexual assault and

battery of a child against the City and the NYCDOE (Count Six);
(5) negligent hiring against the City and the NYCDOE (Count
Seven), and (6) negligent retention against the City and the
NYCDOE (Count Eight).  (*See* Compl. ¶¶ 30-60.)  As discussed
above, because the City cannot be liable for the acts of the
NYCDOE or its employees, any claims brought against the City and
the NYCDOE shall be construed to be only against the NYCDOE.  To
the extent plaintiffs were intending to sue the City for the acts
of SCI and Investigator Jenkins, the merits of such claims are
discussed further below.

There is, however, a dispute between the plaintiffs and
Mr. Benavides on whether the Second Amended Complaint adequately
pleaded claims of intentional infliction of emotional distress
(Count Three), negligent infliction of emotional distress (Count
Four), and sexual assault and battery of a child against Mr.
Benavides (Count Six).  Mr. Benavides did not move for summary
judgment with respect to these three claims, apparently because
he did not believe that plaintiffs asserted those claims against
him.  (*See* Benavides Mem. at 2; Benavides Reply at 7.)
Plaintiffs, however, argue that a "natural reading and inference
of the plaintiffs' Second Amended Complaint asserts such tort
liability against Benavides and demands damages as a result.  Any
other reading of the Second Amended Complaint is a

misconstruction, wholly unintended by the plaintiffs." (Pls.
Opp'n at 9.)

"The notice pleading standard of the Federal Rules of
Civil Procedure 'requires only 'a short and plain statement of
the claim showing that the pleader is entitled to relief,' in
order to give the defendant fair notice of what the . . . claim
is and the ground upon which it rests.'" *Matson*, 631 F.3d at 72
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)
(quoting Fed. R. Civ. P. 8(a))). With respect to the claims for
intentional infliction of emotional distress (Count Three) and
sexual assault and battery of a child (Count Six), plaintiffs'
Second Amended Complaint falls short of the fair pleading
standard given its lack of clarity and internal inconsistencies.

In the Second Amended Complaint, after each heading for
each of plaintiffs' causes of action, plaintiffs included a bold-
highlighted parenthetical specifying the defendants "against"
whom each claim is asserted. With respect to the bold-type
headings above plaintiffs' claims for intentional infliction of
emotional distress (Count Three), negligent infliction of
emotional distress (Count Four), and sexual assault and battery
of a child (Count Six), the parentheticals specify that such
claims are "Against the CITY of NEW YORK and NYCBE" and each
heading also includes the words "Respondeat Superior." (*See*
Compl. at 10-12.) With respect to plaintiffs' claims of sexual

84

harassment in violation of the New York State Human Rights Law in Count Five, the parenthetical specifies that such claim is "Against All Defendants" and does not include "Respondeat Superior" in the heading.  (*Id.* at 11.)[25]

After reviewing both the headings of each count and the substance of the state law allegations contained in the Second Amended Complaint, the court finds that Mr. Benavides has not been provided fair notice that Counts Three and Six allege claims against him.  Indeed, the claims for intentional infliction of emotional distress (Count Three), negligent infliction of emotional distress (Count Four), and sexual assault and battery of a child (Count Six) allege that the City, the NYCDOE, SCI, and Investigator Jenkins adopted, approved, and ratified Mr. Benavides' actions by their own omissions and misconduct.  Count Three's intentional infliction of emotional distress claim does not specifically allege that Mr. Benavides' own conduct caused plaintiffs' harm.  (*Id.* ¶¶ 37, 40, 50.)  Notwithstanding the heading of Count Four stating that the claim for negligent infliction of emotional distress is brought "Against the City of

---

[25] The original complaint and the first amended complaint pleaded claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and sexual assault "Against All Defendants."  (*See* ECF No. 1, Complaint at 8, 10; ECF No. 2, Amended Complaint at 8-10.)  These previous complaints, however, were superseded by the Second Amended Complaint, which is the operative complaint.  *See Dluhos v. Floating & Abandoned Vessel Known as "New York"*, 162 F.3d 63, 68 (2d Cir. 1998) ("[I]t is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (citation omitted)).

New York and the NYCBE," Count Four does explicitly name Mr.
Benavides in its allegations of negligent infliction of emotional
distress, and in a conclusory fashion, alleges that he and others
engaged in negligent conduct.  (*Id.* ¶¶ 38-40.)

Accordingly, the court agrees with Mr. Benavides that
plaintiffs failed to name him and state claims of intentional
infliction of emotional distress (Count Three) and sexual assault
and battery of a child (Count Six) against Mr. Benavides in his
individual capacity.  To the extent Ms. Doe wishes to amend the
Second Amended Complaint to properly bring such claims against
Mr. Benavides pursuant to Federal Rule of Civil Procedure 15,
instructions are provided in the conclusion section of this
decision.

### 1.   Supplemental Jurisdiction Over State Law Claims

As the court has granted summary judgment dismissing
plaintiffs' federal claims against all of the defendants except
Mr. Benavides, the question arises whether the court should
continue to exercise jurisdiction over plaintiffs' remaining
state law claims.  In cases in which district courts have
original jurisdiction, the courts also have jurisdiction over
"all other claims that are so related to claims in the action
within such original jurisdiction that they form part of the same
case or controversy under Article III of the United States
Constitution."  28 U.S.C. § 1367(a).

Section 1367(c) allows the court to decline to exercise supplemental jurisdiction over a state law claim if (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.  28 U.S.C. § 1367(c).

Here, clauses (1), (2), and (3) do not apply as plaintiffs' state law claims are not so novel or complex to justify declining jurisdiction and those claims do not predominate over the sole remaining federal Section 1983 claim against Mr. Benavides, over which this court has original jurisdiction.  Finally, the court does not find that this case presents exceptional or compelling circumstances warranting that the court decline to exercise supplemental jurisdiction.  *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998) ("The use of 'exceptional circumstances' indicates that 'Congress has sounded a note of caution that the bases for declining jurisdiction should be extended beyond the circumstances identified in subsections (c)(1)-(3) only if the circumstances are quite unusual.'" (citation omitted)). Accordingly, the court has jurisdiction to resolve plaintiffs'

87

state law claims against the parties alleged and will address each such claim in turn.

### 2. Intentional Infliction of Emotional Distress

Plaintiffs bring claims of intentional infliction of emotional distress against the City and NYCDOE in Count Three. "Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citation omitted)); *see Tesoriero*, 382 F. Supp. 2d at 403. "Liability will be found 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Howell v. New York Post Co.,* 612 N.E.2d 699, 702 (N.Y. 1993)).

As discussed previously, based on the undisputed evidence in the record, the conduct of the NYCDOE was not extreme or outrageous and was not clearly unreasonable, and there can be no finding that its conduct caused any injury to Ms. Doe or Ms. Romero. Indeed, as discussed at length above, the undisputed record established that the NYCDOE took immediate, affirmative

steps to commence an investigation by SCI into a possibly inappropriate relationship between Mr. Benavides and Ms. Doe and to stop Mr. Benavides' sexual harassment and abuse of Ms. Doe once the NYCDOE learned of it by immediately relieving Mr. Benavides of his teaching duties and removing him from Richmond Hill.

Moreover, there is no evidence in the record to support the second element of the cause of action - that the NYCDOE *intended* to cause Ms. Doe or Ms. Romero severe emotional distress - nor can any such inference be drawn.  *See Tesoriero*, 382 F. Supp. 2d at 403 (granting summary judgment where plaintiffs offer no evidence that defendant teacher or defendant school district "ever *intended* to cause [plaintiffs] severe emotional distress.").  Accordingly, the court grants summary judgment in favor of the City and the NYCDOE on Ms. Doe's and Ms. Romero's respective claims of intentional infliction of emotional distress.  If plaintiffs also intended to bring intentional infliction of emotional distress claims against the City for the acts of SCI and Investigator Jenkins, such claims fail for the same reasons above.

To the extent the plaintiffs are seeking to hold the NYCDOE liable for Mr. Benavides' conduct as an employee of the NYCDOE on a theory of respondeat superior, plaintiffs' claims are meritless.  Under New York law, "an employer is responsible for

an employee's intentional tort only when the employee was acting within the scope of his or her employment when he or she committed the tort." *Girden v. Sandals Int'l*, 262 F.3d 195, 205 (2d Cir. 2001) (citation omitted); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) ("[A]n employer is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business." (citation omitted)), *abrogated on other grounds by*, *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998); *Mirabadi v. Nurbakhsh*, No. 92 Civ. 7734 (MGC), 1995 U.S. Dist. LEXIS 13780, at *5 (S.D.N.Y. Sept. 20, 1995) ("Under the doctrine of respondeat superior, an employer may be held liable for the acts of an employee if such acts are within the scope of employment and in furtherance of the employer's business."). Although the ultimate determination of whether an employee was acting within the scope of employment at a particular time requires a fact-intensive inquiry and is ordinarily for the jury, the Second Circuit has recognized that "it can be made as a matter of law in some instances." *Girden*, 262 F.3d at 205 (citations omitted). Indeed, "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *Swarna v. Al-Awadi*, 622 F.3d 123, 144-45 (2d Cir.

2010) (citation omitted); *Girden*, 262 F.3d at 205 (collecting

cases).

       Here, the court finds that Mr. Benavides' conduct with

respect to his illegal sexual relationship with Ms. Doe falls

outside the scope of his NYCDOE employment and was clearly not in

furtherance of his employer's interest.[26]  This ruling is

consistent with that of the New York Court of Appeals:

> The doctrine of respondeat superior renders an
> employer vicariously liable for torts committed by an
> employee acting within the scope of the employment.
> Pursuant to this doctrine, the employer may be liable
> when the employee acts negligently or intentionally,
> so long as the tortious conduct is generally
> foreseeable and a natural incident of the employment.
> If, however, an employee 'for purposes of his own
> departs from the line of his duty so that for the time
> being his acts constitute an abandonment of his
> service, the master is not liable.'  Assuming
> plaintiff's allegations of sexual abuse are true, it
> is clear that the employee here departed from his
> duties for solely personal motives unrelated to the
> furtherance of the Hospital's business.   Accordingly,
> the courts below properly dismissed plaintiff's
> respondeat superior cause of action.

*Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (N.Y.

1999) (citations omitted); s*ee Higgins v. Metro-North R.R. Co.*,

318 F.3d 422, 426 (2d Cir. 2003) ("It is well settled that sexual

harassment 'consisting of unwelcome remarks and touching is

motivated solely by individual desires and serves no purpose of

---

[26]  Although the court has determined that a reasonable jury could
find that Mr. Benavides was acting under color of state law for the Section
1983 claim against him, "[w]hether actions are performed 'in the scope of
employment' is a different inquiry as to whether those acts were made 'under
color of state law' for § 1983 purposes."  *Menghi v. Hart*, 745 F. Supp. 2d 89,
101 (E.D.N.Y. 2010).

the employer.'" (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 794 (1998))); *Alexander v. Westbury Union Free Sch. Dist.*, No. CV10-0606(WDW), 2011 U.S. Dist. LEXIS 127738, at *52 (E.D.N.Y. Nov. 4, 2011) (dismissing intentional infliction of emotional distress claim against a school district on respondeat superior grounds because "any behavior by [a principal] that arguably amounts to sexual battery . . . would fall outside the scope of employment as a matter of law, even if the behavior occurred during work hours."); *Mirabadi*, 1995 U.S. Dist. LEXIS 13780, at *5-7 (dismissing intentional infliction of emotional distress claim based on sexual assault against corporate employer because there was not sufficient evidence in the record to establish that sexual assault was a corporate purpose of defendant employer).  Accordingly, plaintiffs' intentional infliction of emotional distress claim against the NYCDOE for Mr. Benavides' conduct on a theory of respondeat superior must be dismissed as a matter of law because Mr. Benavides' illegal sexual relationship with Ms. Doe was outside the scope of his employment.

### 3.   Negligent Infliction of Emotional Distress

Plaintiffs also bring claims for negligent infliction of emotional distress against the City and the NYCDOE in Count Four.  These claims fail, however, for many of the same reasons as plaintiffs' intentional infliction of emotional distress

claims. First, negligent infliction of emotional distress also requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress. *Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010); *see Higgins*, 318 F.3d 422, 425 n.1 (2d Cir. 2003) (stating that to be actionable, intentional and negligent infliction of emotional distress claims must "be based on conduct that is extreme and outrageous."); *Naughright v. Weiss*, No. 10 Civ. 8451, 2011 U.S. Dist. LEXIS 133742, at *45-46 (S.D.N.Y. Nov. 18, 2011) ("A cause of action for either intentional or negligent infliction of emotional distress must allege that the defendants' conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in  a civilized community.'" (citation omitted)). As discussed above, and with all reasonable inferences and ambiguities resolved in favor of the plaintiffs, the conduct of the NYCDOE was not extreme and outrageous and did not cause any injury to Ms. Doe or Ms. Romero.

Second, to succeed on a claim of negligent infliction of emotional distress under a "direct duty theory,"[27] "it is well settled that the 'circumstances under which recovery may be had for purely emotional harm are extremely limited and, thus, a cause of action seeking such recovery must generally be premised upon a breach of a duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety.'" *Simpson*, 702 F. Supp. 2d at 135. Here, on the undisputed record before the court, there cannot be a finding that the NYCDOE had a duty to Ms. Romero, nor that the NYCDOE's conduct endangered Ms. Doe's or Ms. Romero's physical safety or caused them to fear for their own safety.

Third, to the extent plaintiffs seek to hold the NYCDOE liable for Mr. Benavides' conduct on a theory of respondeat superior, this claim fails for the reasons previously stated. Accordingly, the court grants summary judgment in favor of the City and the NYCDOE on plaintiffs' claims of negligent infliction

---

[27] The other theory under which a plaintiff could establish a claim of negligent infliction of emotional distress, the "bystander" theory, is inapplicable to this case. Under the "bystander" theory, a plaintiff may recover for a purely emotional injury when "(1) she is threatened with physical harm as a result of defendant's negligence; and (2) consequently she suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (citation omitted). Here, there are no facts in the record to support a finding that Ms. Doe or Ms. Romero witnessed the death or serious bodily injury of an immediate family member. Moreover, Ms. Romero was never threatened with any physical harm.

of emotional distress.  If plaintiffs also intended to bring a negligent infliction of emotional distress claim against the City for the acts of SCI and Investigator Jenkins, such claims also fail for the same reasons.

As noted above, Mr. Benavides did not move for summary judgment with respect to plaintiffs' negligent infliction of emotional distress claim because he did not believe any such claim was asserted against him.  (Benavides Mem. at 2.)  The court will nevertheless address this issue and finds that plaintiff Jane Doe may sustain a claim of negligent infliction of emotional distress against Mr. Benavides.  A reasonable jury could find on the record before the court, with all reasonable inferences and ambiguities resolved in favor of the plaintiffs, that Mr. Benavides' conduct with respect to Ms. Doe (1) was extreme and outrageous, (2) breached a duty owed directly to Ms. Doe and endangered her physical safety, and (3) caused severe emotional distress.

First, there are sufficient facts in the record to support a finding that Mr. Benavides, as Ms. Doe's mathematics teacher, engaged in extreme and outrageous conduct by having an illegal sexual relationship with her - a fourteen-year-old female freshman student – that lasted over six months and to which she could not legally consent.  Second, teachers "ha[ve] the duty to exercise the same degree of care and supervision over the pupils

under [their] control as a reasonably prudent parent would
exercise under the same circumstances." *T.Z.*, 635 F. Supp. 2d at
183 (citing *Mirand v. City of New York*, 637 N.E.2d 263, 266 (N.Y.
1994) (stating that "[t]he duty owed derives from the simple fact
that a school, in assuming physical custody and control over its
students, effectively takes the place of parents and
guardians.")).  A reasonable jury could thus find that Mr.
Benavides breached his duty to Ms. Doe and endangered her
emotional and physical safety by having sex with her on several
occasions when she could not legally consent to sexual
intercourse.

        Finally, there is evidence in the record to support a
finding that Mr. Benavides' conduct caused Ms. Doe to suffer
severe emotional distress.  Ms. Doe began seeing a psychologist
with regularity in the years following her relationship with Mr.
Benavides because she was feeling "very down," "had some
depression," and "didn't feel well."  (04/29/09 Doe Dep. Tr. at
52-55.)  In addition, almost two years after her relationship
with Mr. Benavides, Ms. Doe reflected on the relationship,
testifying that she "realize[d] that [Mr. Benavides] manipulated
[her]" and "wanted to take advantage of [her]."  (*Id.* at 56.)
She also stated during her deposition that, because of the
relationship, she has not had "contact with any men," that her
relationship with her mother "isn't going well," and that the

96

relationship has "affected me a lot.  I feel like I'm not
normal."  (*Id.* at 56-57.)

The court is aware that the "New York Court of Appeals
has strongly cautioned against allowing emotional distress claims
to be brought where other tort remedies are available." *Moore v.
City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002)
(citation and quotation marks omitted); *see Devito v. Barrant*,
No. 03-CV-1927 (DLI), 2005 U.S. Dist. LEXIS 22444, at *30
(E.D.N.Y. Aug. 23, 2005) (dismissing claims for negligent or
intentional infliction of emotional distress because "'the
conduct underlying the claim[s] falls within the ambit of
traditional tort liability' and is included in plaintiff's claims
for assault and battery" (quoting *Moore*, 219 F. Supp. 2d at
339)); *Wahlstrom v. Metro-North Commuter R.R.*, 89 F. Supp. 2d
506, 531-532 (S.D.N.Y. 2000) (dismissing negligent infliction of
emotional distress claim on the basis that, because "the actions
alleged here were 'intentional and deliberate and allegedly in
their nature offensive,' they are 'outside the ambit of
actionable negligence.'" (citation omitted)).  Although plaintiff
Jane Doe may bring assault and battery claims against Mr.
Benavides by amending the Second Amended Complaint, it is
uncertain whether such claims are "available" to Ms. Doe under
state law.

"Under New York law, an 'assault' is an intentional
placing of another person in fear of imminent harmful or
offensive contact.  A 'battery' is an intentional wrongful
physical contact with another person without consent." *Girden*,
262 F.3d at 203 (citation and quotation marks omitted).  A line
of cases decided by the New York Appellate Division, Second
Judicial Department, suggests that a minor plaintiff who is the
victim of statutory rape may not succeed on a civil claim for
assault without a showing of force or the requisite intent by a
defendant to place the minor in fear of imminent harmful or
offensive contact, nor on a civil claim for battery without
showing a lack of consent to the wrongful physical contact, even
though the minor plaintiff could not legally consent to sexual
intercourse under the criminal code.  *See Stavroula S. v.
Guerriera*, 598 N.Y.S.2d 300, 301 (N.Y. App. Div. 2d Dep't 1993)
(finding that "defendant's plea of guilty to statutory rape [of a
fourteen-year-old] did not establish as a matter of law that he
forcibly assaulted her" and that "since lack of consent is not an
element of [statutory] rape, the doctrine of collateral estoppel
does not bar the defendant from litigating the issue of whether
he touched the plaintiff without her consent, which is the
gravamen of the tort of battery"); *see also Roe v. Barad*, 647
N.Y.S.2d 14, 15 (N.Y. App. Div. 2d Dep't 1996) (finding that
defendant convicted of the use of a fifteen-year-old child in a

sexual performance may still litigate whether minor plaintiff consented); *Barton v. Bee Line, Inc.*, 265 N.Y.S. 284, 285 (N.Y. App. Div. 2d Dep't 1933) ("The court is of the opinion that a female under the age of eighteen has no cause of action against a male with whom she willingly consorts, if she knows the nature and quality of her act."); *In re Doe v. Bd. of Educ. of Penfield Sch. Dist.*, 12 Misc. 3d 1197A (N.Y. Sup. Ct. 2006) ("The Penal Code Sec. 130.05 precluding sexual consent by children under 17 years of age may not be applicable in a civil suit. (citations omitted)).[28]

Here, Mr. Benavides maintains that, during their illegal sexual relationship, Ms. Doe considered him "her boyfriend" and that she was never physically forced or otherwise coerced to have a sexual relationship with him. (Benavides 56.1 Stmt. ¶¶ 9-11.) Although Ms. Doe states that she was a minor at the time and was legally incapable of consenting to a sexual relationship (Pls. Benavides 56.1 Stmt. ¶ 9-11), she testified that, during her relationship with Mr. Benavides, she "loved

---

[28]   At least one justice of the New York Appellate Division, Second Judicial Department, has questioned this line of cases, which started with the decision in *Barton*, 265 N.Y.S. 284. *See Colon v. Jarvis*, 742 N.Y.S.2d 304, 306-07 (N.Y. App. Div. 2d Dep't 2002) (Miller, J., concurring) ("At the time it was decided in 1933, *Barton* was contrary to the contemporaneous weight of authority from New York and from many other jurisdictions which did not preclude civil recovery by an underaged victim for an adult's sexual predations.  The weight of later authority likewise generally permits a right of recovery. . . .  In my opinion, *Barton* was of questionable merit when it was decided, and its holding should be reexamined at the appropriate time. . . .  Therefore, until such time as this Court is required to determine the complex issue involved, *Barton*'s precedential value should not be presumed.").

him," was "completely illusioned by him," and that she "had never been with anyone and it seemed very special." (04/29/09 Doe Dep. Tr. at 32-33.) Moreover, Ms. Doe testified that although she previously refused to engage in sexual relations with Mr. Benavides, she did agree to do so in January 2007 and thereafter. (*Id.* at 12-13, 26-32.)

Accordingly, because it is uncertain whether intentional tort claims for assault and battery against Mr. Benavides are available to Ms. Doe under New York law, Ms. Doe's claim for negligent infliction of emotional distress against Mr. Benavides may proceed at this time. Ms. Doe must, however, amend her claim for negligent infliction of emotional distress in the Second Amended Complaint and plead the claim more clearly against Mr. Benavides in accordance with the requirements of Federal Rule of Civil Procedure 8(a).

Finally, the court grants summary judgment in favor of all defendants on plaintiff Pilar Romero's claims of negligent infliction of emotional distress. There are no facts in the record from which a reasonable fact finder could conclude that (1) Ms. Romero was the victim of extreme and outrageous conduct by defendants, (2) that defendants breached a duty owed directly to Ms. Romero, (3) that Ms. Romero's physical safety was endangered by defendants' conduct or that she feared for her own physical safety, or (4) that she suffered any severe emotional

100

distress.  Any such claims are therefore dismissed in their
entirety.

> **4.    Sexual Harassment in Violation of New York State
> Human Rights Laws Pursuant to New York Executive
> Law § 296**

Plaintiffs bring a cause of action in Count Five
against all defendants for sexual harassment under New York State
Human Rights Laws (the "NYSHRL") pursuant to Executive Law §
296(4), which states the following in relevant part:  "It shall
be an unlawful discriminatory practice for an education
corporation or association . . . to permit the harassment of any
student or applicant, by reason of his race, color, religion,
disability, national origin, sexual orientation, military status,
sex, age or marital status . . . ."  N.Y. Exec. Law § 296(4).
There is limited case law addressing the requirements to sustain
a cause of action under Executive Law § 296(4).  The court finds,
however, that summary judgment is warranted on these claims
against all defendants.

First, because SCI is not an "education corporation or
association" according to the plain language of Executive Law
§ 296(4), the NYSHRL claim against SCI must be dismissed.  In
addition, "employee[s] cannot be found liable under section
296(4) because that section applies only to education
corporations, which the employees obviously are not."  *TC v.
Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 604 (S.D.N.Y.

2011).  Accordingly, the NYSHRL claims against Investigator

Jenkins and Mr. Benavides under Executive Law § 296(4) must also

be dismissed.  Plaintiffs' claim under Executive Law § 296(4) may

against the NYCDOE will next be considered.[29]

Second, Executive Law § 296(4) prohibits the NYCDOE

from "permitting" discrimination on the basis of sex.

Plaintiffs, however, have failed to present any evidence that the

NYCDOE somehow authorized, condoned, or acquiesced to Mr.

Benavides' allegedly discriminatory conduct toward Ms. Doe.  *See*

*JG v. Card*, No. 08 Civ. 5668 (KMW), 2009 U.S. Dist. LEXIS 85372,

at *34-35 (S.D.N.Y. Sept. 16, 2009) (citing *Planck v. SUNY Bd. of*

*Trs.*, 795 N.Y.S.2d 147, 148-50 (N.Y. App. Div. 3d Dep't 2005)

(dismissing NYSHRL Section 296(4) claim against university and

its board of directors where plaintiff failed to allege that

defendants took any specific actions to cause or permit the

alleged discrimination)); *In re Ithaca City School Dist.*, 926

---

[29]  Following the decision of the New York Appellate Division,
Second Judicial Department in *East Meadow Union Free Sch. Dist. v. New York
State Div. of Human Rights*, 886 N.Y.S.2d 211 (N.Y. App. Div. 2d Dep't 2009),
*leave to appeal denied by*, 14 N.Y.3d 710 (N.Y. 2010), which found that a
school district is a public corporation and thus "cannot be an 'education
corporation' *within the meaning of Human Rights Law § 296(4)*," *id.* at 212,
several district courts in the Second Circuit have also dismissed claims
against school districts on this ground.  *See, e.g.*, *TC*, 777 F. Supp. 2d at
604; *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 148-49
(N.D.N.Y 2011); *Camac v. Long Beach City Sch. Dist.*, No. 09 CV 5309 (DRH)
(ARL), 2011 U.S. Dist. LEXIS 79997, at *55-56 (E.D.N.Y. July 22, 2011).  The
New York Appellate Division, Third Department, however, has held the opposite,
concluding that Executive Law § 296(4) is applicable to school districts.  *In
re Ithaca City School Dist. v New York State Div. of Human Rights*, 926
N.Y.S.2d 686, 690 (N.Y. App. Div. 3d Dep't 2011), *appeal granted by*, 958
N.E.2d 553 (N.Y. 2011).  The court will assume for the purposes of this
opinion that Section 296(4) does apply to the NYCDOE.

N.Y.S.2d at 690 (finding that a violation of Section 296(4) "occurs when a school district . . . permit[s] the harassment of any student or applicant[] by reason of his [or her] race" and concluding that the school district "permitted students to engage in a course of racially-motivated harassment of respondent's daughter" (internal citation omitted)); *see also Pellier v. British Airways, Plc.*, No. 02-CV-4195, 2006 U.S. Dist. LEXIS 3219, at *37-39 (E.D.N.Y. Jan. 17, 2006) ("[I]t has been well documented, by both federal courts within the Second Circuit and by New York state courts, that employer liability under NYSHRL is not judged under *respondeat superior,* but instead requires a more stringent showing, in particular, that the employer had knowledge of and acquiesced in, or subsequently condoned, the discriminatory conduct." (citations and quotations marks omitted)); *Doe v State of New York*, 933 N.Y.S.2d 688, 690 (N.Y. App. Div. 2d Dep't 2011) ("'Under the Executive Law [Section 296], [a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.' It is only after an employer knows or should have known of improper discriminatory conduct that it can 'undertake or fail to undertake action which may be construed as condoning the improper conduct.'" (citations omitted); *Martinez v. Triangle Maint. Corp.*, 293 A.D.2d 721, 722 (N.Y. App. Div. 2d Dep't 2002) (granting summary judgment for

claims asserted against defendant employers under Section 296 where defendants "acted appropriately when confronted with [plaintiff's] complaints of sexual and religious harassment" and there was "no evidence that the defendants encouraged, condoned, or approved the alleged conduct.").

As described previously, because the NYCDOE did not have knowledge of the illegal sexual relationship between Mr. Benavides and Ms. Doe prior to June 8, 2007, and immediately took appropriate remedial measures upon learning of the relationship, plaintiffs' claim that the NYCDOE "permitted" or "encouraged, condoned, or approved" Mr. Benavides's allegedly discriminatory conduct is not supported by any evidence in the record and thus summary judgment is granted in favor of the City and the NYCDOE.

Third, to the extent plaintiffs seek to hold Investigator Jenkins and Mr. Benavides personally liable as aiders and abettors pursuant to Executive Law § 296(6), which states that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so," N.Y. Exec. Law § 296(6), such claims must also be dismissed. The Second Circuit had held that "an individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he 'actually participates in the conduct giving rise to a discrimination claim.'" *Rojas v. Roman*

*Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quoting *Tomka*, 66 F.3d 1295 at 1317 (2d Cir. 1995)). After *Tomka*, however, there has been a dispute among district courts in the Second Circuit (1) whether an individual can be held liable for aiding and abetting his own conduct giving rise to a claim under Executive Law § 296(6); and (2) whether an individual can be held liable where there is no violation of the NYSHRL by the employer/principal, such as the NYCDOE here. *Compare Alexander*, 2011 U.S. Dist. LEXIS 127738 at *60-64 (dismissing claim against school principal under Executive Law § 296(6) because of the absence of any employer liability under the NYSHRL), *Raneri v. McCarey*, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) (finding that "[a]n individual cannot aid and abet his own alleged discriminatory conduct" under Executive Law § 296(6) (citation omitted)), *and DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999) (dismissing NYSHRL claims against an individual because of the "requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor" (citation omitted)), *with Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 263 (E.D.N.Y. 2009) (finding that an individual defendant may be held liable for aiding and abetting his own conduct under Executive Law § 296(6)), *and Tully-Boone v. North Shore-Long Island Jewish Hosp. Sys.*, 588 F.

Supp. 2d 419, 427 (E.D.N.Y. 2008) (finding that an employee "may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where [the employee's own] actions serve as the predicate for the employer's vicarious liability")); *see also Strauss v. New York State Dep't of Educ.*, 805 N.Y.S.2d 704, 709 (N.Y. App. Div. 3d Dep't 2005) ("Where no violation of the Human Rights Law by another party has been established, we find that an individual employee cannot be held liable for aiding or abetting such a violation.  In other words, we hold that individuals cannot be held liable under Executive Law § 296 (6) for aiding and abetting their own violations of the Human Rights Law.")).

The court need not resolve this issue, however, because plaintiffs themselves concede that Mr. Benavides "is not personally liable here" (Pls. Benavides Opp'n at 8), and as discussed above, the NYCDOE cannot be held liable under the NYSHRL for Mr. Benavides' conduct on a theory of respondeat superior.  *See Pellier*, 2006 U.S. Dist. LEXIS 3219, at *37-39. Moreover, there is no evidence in the record that Investigator Jenkins aided and abetted any violation of the NYSHRL. Accordingly, summary judgment is granted in favor of all defendants on plaintiffs' claims under the NYSHRL pursuant to Executive Law § 296 as alleged in Count Five.

### 5. Sexual Assault and Battery of a Child (Rape)

Plaintiffs bring a claim of sexual assault and battery of a child against the City and the NYCDOE in Count Six. As noted above, under New York law, an "assault" is "an intentional placing of another person in fear of imminent harmful or offensive contact," and a "battery" is "an intentional wrongful physical contact with another person without consent." *Girden*, 262 F.3d at 203 (citation omitted). Because a reasonable jury could not find that the City or the NYCDOE itself committed sexual assault and battery against Ms. Doe, and nor the City nor the NYCDOE can be held vicariously liable for Mr. Benavides' conduct on a theory of respondeat superior, summary judgment is granted in favor of the City and the NYCDOE on these claims. If plaintiffs also intended to bring assault and battery claims against the City for the acts of SCI and Investigator Jenkins, such claims fail for the same reasons.

### 6. Negligent Hiring

Plaintiffs bring a claim against the City and the NYCDOE for negligently hiring Mr. Benavides in Count Seven. An employer can only be liable for the negligent hiring of an employee if it knew or should have known of the employee's tortious propensities at the time of hiring. *Tesoriero*, 382 F. Supp. 2d at 401 (citing *Estevez-Yalcin v. Children's Vill.,* 331 F. Supp.2d 170, 175 (S.D.N.Y. 2004)). The record is devoid of

any evidence regarding the hiring of Mr. Benavides, let alone any evidence suggesting that either the City or the NYCDOE knew or should have known of any propensity of Mr. Benavides to sexually abuse or assault his students or to enter into inappropriate relationships with them at the time of his hiring.  Accordingly, the court grants summary judgment on this claim in favor of the City and the NYCDOE.  *See Bliss*, 2011 U.S. Dist. LEXIS 35485, at *28-29 (granting summary judgment where "there is no evidence that defendants knew or should have known about [a teacher's] alleged-propensity for committing sexual assault when he was hired"); *Tesoriero*, 382 F. Supp. 2d at 401 (granting summary judgment in favor of school district where "there are no facts to indicate that [it] knew or should have known about [a teacher's] alleged propensity to sexually harass female students when he was hired" (quotation omitted)).

### 7.   Negligent Retention

Finally, plaintiffs bring a claim against the City and the NYCDOE for negligently retaining Mr. Benavides as an employee in Count Eight.  "To avoid summary judgment on the issue of negligent retention, . . . a plaintiff must offer evidence that the defendant negligently failed to terminate an employee - that is, that the defendant knew or should have known of the employee's propensity to commit acts meriting dismissal, yet failed to act accordingly."  *Tesoriero*, 382 F. Supp. 2d at 401;

see also *Adorno v. Corr. Servs. Corp.*, 312 F. Supp. 2d 505, 519 (S.D.N.Y. 2004) ("[A]n employer is 'required to answer in damages for the tort of an employee against a third party when the employer has . . . retained the employee with knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm.'" (citation omitted)).

There is no evidence in the record that the defendants knew or should have known of any conduct by Mr. Benavides warranting dismissal prior to June 8, 2007.  On June 8, 2007, two days after contacting SCI to conduct an investigation with respect to a possibly inappropriate relationship between Mr. Benavides and Ms. Doe, and immediately upon learning of the illegal sexual relationship, Principal De Sanctis, a person with supervisory authority over Mr. Benavides, removed him from all his teaching responsibilities and transferred him to a NYCDOE reassignment center where he had no further interaction with children.  Although Mr. Benavides' employment was not officially terminated for six months until December 2007, it is not genuinely disputed that he never again taught another NYCDOE class or returned to Richmond Hill after June 8, 2007.  Moreover, there is no evidence in the record that Ms. Doe was caused any harm by the NYCDOE's decision to transfer Mr. Benavides to a reassignment center rather than immediately terminating his employment, even assuming that his employment could be

109

immediately terminated.[30]  Accordingly, on the undisputed facts

in the record, the court finds that the NYCDOE did not

negligently retain Mr. Benavides and grants summary judgment in

favor of the City and NYCDOE on this claim as well.

### CONCLUSION

For the foregoing reasons, the motions for summary

judgment by the City, the NYCDOE, SCI, and Investigator Jenkins

are granted in their entirety on all claims against them.  The

Clerk of the Court is respectfully requested to enter a partial

judgment in favor of the City, the NYCDOE, SCI, and Investigator

Jenkins in accordance with this decision.

The court grants in part and denies in part Mr.

Benavides' motion for summary judgment as follows:  (1) grants

Mr. Benavides summary judgment on plaintiffs' Title IX claims;

(2) grants Mr. Benavides summary judgment on plaintiffs' Section

1983 claims against him in his official capacity, and on Ms.

Romero's Section 1983 claim against him in his individual

capacity; (3) denies Mr. Benavides summary judgment on Ms. Doe's

Section 1983 claim against him in his individual capacity for

violations of Ms. Doe's constitutional rights to bodily integrity

and to an educational environment free of sexual harassment; (4)

grants Mr. Benavides summary judgment on Ms. Romero's negligent

infliction of emotional distress claim; (5) denies Mr. Benavides

---

[30]  *See supra* note 16.

summary judgment on Ms. Doe's negligent infliction of emotional distress claim; and (6) grants Mr. Benavides summary judgment on plaintiffs' NYSHRL claims.

The defendants' motions for summary judgment are granted on all of plaintiff Pilar Romero's claims and her claims are dismissed.  Because plaintiff Jane Doe is now of legal age to be substituted as the real party in interest and the only claims remaining in this action are Ms. Doe's Section 1983 and negligent infliction of emotional distress claims against Mr. Benavides in his individual capacity, the Clerk of the Court is respectfully requested to amend the caption of this case to reflect Jane Doe as the only plaintiff in this case.

To the extent plaintiff Jane Doe wishes to amend the Second Amended Complaint to assert claims of intentional infliction of emotional distress and/or sexual assault and battery against Mr. Benavides in his individual capacity pursuant to Federal Rule of Civil Procedure 15[31], Ms. Doe shall serve a proposed Third Amended Complaint on Mr. Benavides within two weeks of the date of this decision or by March 30, 2012.  The Third Amended Complaint shall also contain a more clearly pleaded

---

[31]  Because these claims accrued during Ms. Doe's infancy, the statute of limitations for these claims was tolled during her infancy.  *See* N.Y. C.P.L.R. § 208.  An amendment of the Second Amended Complaint to assert claims of intentional infliction of emotional distress and/or sexual assault and battery against Mr. Benavides would relate back to the date of the original complaint because such claims "arise out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  Fed. R. Civ. Proc. 15(c)(1).

claim for negligent infliction of emotional distress against Mr. Benavides, as previously discussed.  If Mr. Benavides does not stipulate to the amendment by April 6, 2012, Ms. Doe shall file a letter with the court by April 9, 2012 with a proposed briefing schedule for her motion for leave to file a Third Amended Complaint.  In any such motion, Ms. Doe shall explain why "justice so requires" that leave to amend be granted in light of the long ago closure of discovery.  *See* Fed. R. Civ. Proc. 15(a)(2).  If Ms. Doe does not wish to amend the complaint, her counsel and Mr. Benavides shall confer and file a joint status letter via ECF within one week of this decision advising the court as to how they wish to proceed with this case, and if necessary, when they will be available for trial.

Ms. Doe shall serve a copy of this Memorandum and Order on Mr. Benavides by March 20, 2012 and file a certificate of service via ECF by March 21, 2012.

**SO ORDERED.**

Dated:      March 16, 2012
            Brooklyn, New York

_____
                    /s/

KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York